# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

VALTRUS INNOVATIONS LTD.,

Plaintiff,

v.

**Case No. 3:22-cv-00066-n**

GOOGLE LLC,

Defendant.

**<u>DECLARATION OF DR. AMY N. LANGVILLE IN SUPPORT OF PLAINTIFF
VALTRUS INNOVATIONS LTD.'S OPPOSITION TO DEFENDANT GOOGLE'S
MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(6)</u>**

**CONFIDENTIAL INFORMATION**

**CONFIDENTIAL INFORMATION**

## I.    INTRODUCTION

1.    My name is Amy N. Langville. I have been retained as an expert in this matter by Valtrus Innovations Ltd. ("Valtrus") to provide my independent opinions on certain issues in connection with U.S. Patent Nos. 6,728,704, 6,738,764, and 7,346,604. I am being compensated for my work in this matter at my standard hourly rate of $500.00 per hour. My compensation does not depend on the substance of my opinions, the outcome of this case, or any issue in it, and I have no interest in this proceeding.

## II.    BACKGROUND AND QUALIFICATIONS

2.    My qualifications and relevant experience are summarized below and addressed more fully in my curriculum vitae, attached as Exhibit 1 to this declaration.

3.    Following my graduation in 1997 from Mount Saint Mary's College with a Bachelor's of Science in Mathematics, I completed a Ph.D. in Operations Research at North Carolina State University in 2002. From 2002 to 2005, I held a postdoctoral position in the Mathematics department at North Carolina State, where I studied the mathematics behind search engines like Google.

4.    Since 2005, I have worked as a Professor in the Mathematics department of the College of Charleston, where I currently teach courses in calculus, multivariable calculus, optimization and linear programming, and operations research. In the past, I have taught special topics courses and led theses related to complex datasets, recommendation systems, clustering, graph theory and graph analytics, integer programming, Markov chains, text mining, and ranking and rankability.

5.    I have extensive experience in the field of search engines and the mathematical processes behind ranking. I have authored or co-authored 40 peer-reviewed publications and given over 90 talks, related to, among other things, the mathematics behind Google's search engine and

**CONFIDENTIAL INFORMATION**

other search engines, the use of linear algebra in Internet search engines, information retrieval on the Web, and ranking methods and models. I have also authored a patent in the field.

6.      I am the co-author of two books on the topics of rating and ranking. *Google's PageRank and Beyond: The Science of Search Engine Rankings*[1] was the first ever book to describe the science of World Wide Web page rankings in depth. This book won Honorable Mention for the 2006 Award for Best Professional/Scholarly Book in Computer and Information Science from the Association of American Publishers.

7.      My second book, *Who's #1?: The Science of Rating and Ranking*[2], examines how rating and ranking methods are used in search engines and other applications in ways which influence decisions both on and off the World Wide Web. Both of these books are highly cited with thousands of citations, and have been translated into several languages including Chinese, Japanese, Greek, and Russian.

## III.    MATERIALS CONSIDERED

8.      In preparing my analysis, I reviewed at least the following materials:

a)   U.S. Patent Nos. 6,728,704; 6,738,764; and 7,346,604.

b)   The prosecution histories of each of the above patents in suit, along with the prior art cited there.

c)   Valtrus's Complaint.

d)   Valtrus's Preliminary Infringement Contentions.

e)   Various articles related to the subject matter of the patents in suit.

f)   Any other documents cited in this declaration.

---

[1] Amy N. Langville & Carl D. Meyer, *Google's PageRank and Beyond: The Science of Search Engine Rankings*, Princeton University Press (July 23, 2006).
[2] Amy N. Langville & Carl D. Meyer, *Who's #1?: The Science of Rating and Ranking*, Princeton University Press (Feb. 26, 2012).

**CONFIDENTIAL INFORMATION**

## IV.    HISTORICAL CONTEXT OF THE PATENTS

9.    The World Wide Web (hereinafter, the "Web") was invented in 1989 by Tim Berners-Lee, a British scientist working at CERN. What started as a single website on a single server expanded rapidly, with some 10 million users browsing the Web across a network of some 10,000 servers by the end of 1994. As the Web grew to encompass millions of pages, so did the need for computer-based tools to catalog and search for useful information across an ever-growing number of hypertext pages. The scale of the Web's growth is difficult to overstate; by 1997, popular search engines were indexing up to 100 million Web documents and handling tens of millions of queries per day.[3] By 1999—the filing date of the first of the three search engine patents discussed here—search engines were indexing 140 million web documents.[4] Today, Google Search's index includes hundreds of billions of webpages, containing "well over 100,000,000 gigabytes" of data.[5] While Google does not publicly release data on the number of searches its search engine processes today, estimates place the number of queries submitted to this one search engine at upwards of 100,000 per second as of this writing.[6]

10.    Search engines are computer-based tools which use automatic programs variously known as bots, crawlers, or spiders to find pages on the Web and form an index of those pages. Even within the first few years after the invention of the Web, the sheer number of webpages made it impossible for human users to find information manually, making search engines the only practical way of accessing meaningful information in a reasonable amount of time. This remains true today. As the size of the Web grew exponentially through the 1990s, search engines such as

---

[3] Sergey Brin and Lawrence Page, *The Anatomy of a Large-Scale Hypertextual Web Search Engine*, *Computer Networks*, vol. 30, 107-117 (1998).

[4] *See* Krishna Bharat and George A. Mihaila, *Hilltop: A Search Engine based on Expert Documents*, WWW9: Proceedings of the ninth international conference on World Wide Web (May 2000) (hereinafter "Hilltop Paper").

[5] https://www.google.com/search/howsearchworks/how-search-works/organizing-information/#:~:text=The%20Google%20Search%20index%20contains,on%20every%20webpage%20we%20index

[6] *See* https://www.internetlivestats.com/one-second/#google-band; *see also* https://www.internetlivestats.com/about/

**CONFIDENTIAL INFORMATION**

AltaVista, DirectHit, and Yahoo! competed for users, adopting various techniques and algorithms both for indexing webpages and for retrieving information in response to user queries. However, the trustworthiness of any of these webpages was impossible to assume, as their content was created by sources of varying quality and authority. Moreover, many webpage authors would attempt to boost their page's ranking by indiscriminately adding keywords or hyperlinks in a manner intended to trick search engines. Such pages are commonly known as "spam pages."

11.     During this time, companies who later became part of Hewlett Packard Enterprise, including Verity and Compaq, were deeply involved in the search engine space. For example, in 1997, Verity unveiled a suite of new search products under the "Search '97" brand, designed to add search capabilities for applications on the Web.[7]

12.     In the summer of 1999, researchers at Compaq's Systems Research Center (formerly owned by Digital Equipment Corporation) developed a new search engine which they called Hilltop. Hilltop was based on a novel ranking scheme that aimed to emphasize authoritative pages in search results.[8] It accomplished this by ranking pages based on "the match between the query and relevant descriptive text for hyperlinks on expert pages," which were identified as directories of links to non-affiliated sources on specific topics.[9] Hilltop presented a new approach to ranking that was able to quickly retrieve highly relevant search results in response to a user's query while more effectively screening out spam pages. Hilltop's inventors, Krishna Bharat and George A. Mihaila, filed for a patent on the Hilltop search engine on October 15, 1999, with Digital Equipment Corporation as the assignee. This application would be granted as the '604 Patent. By

---

[7] https://www.cnet.com/tech/tech-industry/verity-to-debut-new-search-engine/
[8] *See* Hilltop Paper.
[9] Hilltop Paper.

**CONFIDENTIAL INFORMATION**

the end of that same year, Google had hired Bharat to work on "web search and information extraction."[10] Bharat has spent most of his career there since.[11]

## V.    THE PATENTS IN SUIT

13.    I have been asked to examine whether the inventions claimed in the '604, '704, and '764 Patents constituted activities or technologies that were well-understood, routine, or conventional as of their respective priority dates. My review of each of the Patents, their prosecution histories, and the prior art of record revealed that the inventions claimed by each of the Patents were not well-understood, routine, or conventional at the relevant times.

14.    I have also been asked to conduct independent tests in order to evaluate whether and the degree to which the above-named Patents improve the performance of computers or search engines which use each of the claimed inventions.

### a.    Description of Testing Methodology

15.    In order to demonstrate that the inventions claimed by the patents provide significant, non-routine benefits to the performance of a computer system, I designed and ran a private search engine that is modeled after larger, commercial systems. This search engine is capable of indexing hundreds of gigabytes of information across millions of pages. It is designed to be sufficient to show how an implementation of the patents could work in the relevant portions of a search engine system. As such, it omits subsystems irrelevant to the patents, such as sophisticated data pre-processing or output formatting, network interactivity, or scalability to multiple hosts.

16.    The system was built on an HP ENVY TE01-3xxx desktop computer, with a 12th Gen Intel® Core™ i7-12700 running at a maximum of 4.9 GHz, 16 GB of Samsung DDR4 3200

---

[10] https://www.cnbc.com/2019/08/22/google-news-inventor-krishna-bharat-returns-after-four-year-hiatus.html
[11] https://www.cnbc.com/2019/08/22/google-news-inventor-krishna-bharat-returns-after-four-year-hiatus.html

**CONFIDENTIAL INFORMATION**

MT/s DRAM, and a 1TB NVMe SSD used as boot and data storage. The system was left in its default state running Ubuntu 20.04, built for 64-bit x86 systems. The software, including all key parsing, indexing, database, and ranking systems, leverages well-tested open-source tools. I understand that this description and the platform used are consistent with the system used by Dr. Thomas Conte for testing related to another patent.

17.     The search implementation was written in Python 3.10.4 as an object-oriented system. A base search engine class performed all indexing and basic search functions, then three subclasses of this engine were created, one for each Patent. Those subclasses could execute a query both in a manner that uses the relevant claim of each Patent and in an alternative manner. This alternative was selected as appropriate for demonstrative purposes only in the context of this investigation, and may not be appropriate for all systems. The system begins by loading a .ZIM file, a compressed archive of an entire large website. Seven English Wikimedia wikis were selected, including the English language Wikipedia itself. The size of each of these wikis, along with the number of internal links within each, is shown below:

| | Size (GB, uncompressed) | Pages | Links (internal) |
|---|---|---|---|
| wikibooks | 2.0 | 92,022 | 74,944 |
| wikipedia | 221.0 | 6,431,329 | 574,292,802 |
| wikiquote | 0.9 | 42,881 | 577,331 |
| wikisource | 36.0 | 3,402,002 | 1,185,941 |
| wikiversity | 1.1 | 42,755 | 51,156 |
| wikivoyage | 0.9 | 31,257 | 841,850 |
| wiktionary | 44.0 | 7,002,902 | 34,412,735 |
| **total:** | **305.9** | **17,045,148** | **611,436,759** |

**CONFIDENTIAL INFORMATION**

18.    Each corpus was loaded and indexed separately into its own environment, handled by a unique instance of the search class. A Lucene[12] index was created via PyLucene wrappers, as well as several key-value databases backed by the Python "shelve" environment, itself backed by GNU dbm. Each file in the corpus is parsed using the selectolax[13] parsing engine twice: first to strip all tags and code, leaving only human readable text, and a second time to extract the URLs of all links. The human readable text is indexed using the standard Lucene analyzer and the links are stored in a forward-link key-value database. The text and full HTML source code are stored in additional key-value databases for quick access during search. Additionally, the link out-degree is calculated by dividing the number of external links by the total number of links. If the out-degree is greater than a parameter (set at 0.10), the page is deemed an "expert page" and added to a flat-file list.

19.    Finally, after each document is parsed, indexed, and re-stored, a back-link key-value database is formed by iterating through the forward-link database, listing all the pages that link *to* a given page. A search-and-rank function was created that performs the Lucene index search, then loads the text for the documents that are relevant, then ranks the documents using a BM25 text ranking engine. This engine has been shown, in several tests, to be the "best of the known probabilistic weighting schemes."[14]

20.    Finally, a query generator was coded to create corpuses of plausible queries appropriate for each search engine configuration. This tool samples thousands of pages from Wikipedia to generate lists of the 500 most common words, as well as the 2000 most common words in the site overall. A "simple" corpus of queries was generated by randomly sampling the

---

[12] https://lucene.apache.org/
[13] https://github.com/rushter/selectolax
[14] https://xapian.org/docs/bm25.html

**CONFIDENTIAL INFORMATION**

500 most common words. A "complex" query generator selects between one and three words from the top 2000 words that do *not* appear in the top 500 words but that *do* appear together on at least one page. This guarantees that all queries from both corpuses will be relevant for and hit in at least one document.  *See* Figure 1:

**Figure 1**

**Example Generated Queries**

walker zealand
edition rank
square store
williams artists artist
attack irish republican
Reports
oklahoma highway map
stage elizabeth
denmark danish squad
Clade
tom norwegian actor
angeles late
dean zealand
starring comedy cast
poland administrative coordinates
soccer steve men's
Ring
Howard
pm bowl miss
rugby queensland

21.    To test each patented implementation compared to the selected prior art-based alternative implementation, 150 queries are selected at random from the appropriate corpus. Initially, a single query is run without timing to eliminate warm-up and caching effects. Then, each query is tested in both modes. The order in which the query is performed in the patented and

**CONFIDENTIAL INFORMATION**

alternative mode is randomized, again to minimize caching effects. Finally, this process is repeated three times, and the average execution time in both modes is computed.

### b. The '604 Patent

22.     The '604 Patent is entitled "Method for ranking hypertext search results by analysis of hyperlinks from expert documents and keyword scope." The '604 Patent application was filed on October 15, 1999. As discussed above, the '604 Patent covers, among other things, the Hilltop search engine that was proposed by Krishna Bharat and George A. Mihaila in their groundbreaking paper.[15] The '604 Patent specification summarizes the claimed invention as encompassing "two broad phases: (a) expert lookup and (b) target ranking."[16] The first phase involves "forming a set of expert documents from the set of all hypertext documents crawled without reference to [a user's] search query."[17] These expert documents are pages that are "about a certain topic and [have] links to many 'non-affiliated' pages on that topic,"[18] and the expert status of a page is determined according to objective methods described in the specification.[19] The second phase involves ranking both the expert documents and the "target" documents pointed to by the expert documents.

23.     In their white paper describing the Hilltop search engine, Bharat and Mihaila detailed the significant improvements that Hilltop was able to achieve over contemporary competitors, including AltaVista, DirectHit, and Google. In their experiments with a variety of queries, Bharat and Mihaila created two tests to compare their search engine to its peers. The first tested the search engines' ability to locate specific, popular pages within the first few results.[20] Hilltop returned the desired webpage as the first result 87% of the time, compared to Google's

---

[15] The Hilltop Paper has been cited by dozens of United States patents and academic papers, and by numerous publications in other languages.

[16] '604 Patent, 2:53-54.

[17] '604 Patent, 8:48-50.

[18] '604 Patent, 2:55-56.

[19] '604 Patent, 4:65-5:61.

[20] *See* Hilltop Paper.

**CONFIDENTIAL INFORMATION**

80% success rate, DirectHit's 43%, and AltaVista's 20%.[21] As other results beyond the first were taken into account, Hilltop succeeded in returning the desired webpage 97% of the time, compared to DirectHit's 83% and AltaVista's 30%.[22] The second test evaluated the search engines' ability to return results that were relevant to more generalized queries. The results showed that Hilltop returned "a large percentage of highly relevant pages among the ten best ranked pages, comparable with Google and DirectHit, and better than AltaVista."[23] These results are extremely significant, as Google, DirectHit, and AltaVista were all fully optimized commercial search engines, while Hilltop was still in a research phase. For Hilltop to achieve these results at this early stage of development shows that its design was not routine, well-understood, or common. If it was, the highly competitive search engine field would have already employed it.

24.     Because anyone with access to the Internet and basic computer technology can add content to it, the Web has been filled with webpages of questionable trustworthiness since its birth. Because search engines, both at the time of the '604 Patent's invention and now, rely primarily on analyzing the content of webpages and links between them, many webpage authors attempt to boost their page's ranking in search engine result lists by including irrelevant or nonsensical words and links that are designed to mislead search engines into ranking them highly. These "spam pages" can clutter search results and prevent search engine users from finding information relevant to their queries. Even webpages that are not intentionally designed to trick search engines may still contain inaccurate, unhelpful, or irrelevant information.

25.     The Hilltop Paper describes how the Hilltop search engine was able to screen out irrelevant pages using a sophisticated, novel ranking method based on a pre-formed expert index.

---

[21] Hilltop Paper.
[22] Hilltop Paper.
[23] Hilltop Paper.

**CONFIDENTIAL INFORMATION**

The '604 Patent, which covers that search engine, describes this process in detail and clearly shows that the claimed approach was not routine or well-understood at the time of the invention. As the specification points out, "[t]he rapid increase in the number of web pages has increased the difficulty of finding information the web," particularly when a substantial number of those pages contain erroneous or irrelevant information.[24]

26.    That the Web contained a large quantity of low-quality webpages was a major technological problem at the time of the '604 Patent's invention. The '604 Patent defined an unconventional approach to solving that problem.[25] The '604 Patent addressed this issue by proposing an inventive method for not only finding authoritative pages, but for ranking those pages in a way that would be useful for a search engine user. Unlike prior art systems, the method claimed by the '604 Patent "evaluates experts on their content match to the user's query . . . prevent[ing] the scores of 'niche experts' (i.e., experts that point to new or relatively unknown targets) from being driven to zero."[26] It also forms the set of expert documents "from the set of all hypertext documents crawled without reference to the search query,"[27] avoiding prior art approaches that needed to re-form the database with every new query, and reduces bias in the results set by limiting the set of expert documents to those which link to non-affiliated pages.[28]

27.    As another example, U.S. Patent No. 6,285,999, invented in 1998 by Lawrence Page, one of the co-founders of Google, fails to disclose, among other things, forming a set of expert documents without reference to a query, and ranking expert documents in accordance with

---

[24] '604 Patent, 1:17-19.
[25] *See, e.g.*, Soumen Chakrabarti et al., *Automatic Resource Compilation by Analyzing Hyperlink Structure and Associated Text*, WWW7: Proceedings of the seventh international conference on World Wide Web (April 1998).
[26] '604 Patent, 8:32-37.
[27] '604 Patent, 8:48-50.
[28] '604 Patent, 4:48-56.

**CONFIDENTIAL INFORMATION**

a search query.[29] As discussed above, these limitations are part of the unconventional approach proposed by the '604 Patent.

28.     The '604 Patent not only increases the authoritative quality of results, it also results in a quantifiably faster ranking process as compared to alternatives which attempt to evaluate authoritativeness at the time a search query is submitted to the search engine. In contrast to prior art attempts to find authoritative pages on the Web, the '604 Patent forms the set of expert documents in a pre-processing step which occurs prior to and without reference to any particular query, allowing the expert document index to be formed ahead of time and stored for later use.[30] Importantly, this method avoids the need to compute a new subgraph measuring connectivity between expert and subject pages for every possible query, a process which can be computationally intensive to generate, requiring the consideration of millions of pages. The '604 Patent's ability to avoid this computational overhead and improve performance demonstrates that the invention claimed is not routine and conventional.

29.     Industry commentators have also pointed to Hilltop as revolutionary, with one writer noting that readers "may have heard or read that Krishna Bharat rewrote how Google worked in the early 2000s by applying the Hilltop Algorithm to how it works."[31] Others described the dramatic shift in rankings brought about by its implementation, which had the desired effect of screening out webpages which relied on "link farms, stuffed meta tags, superfluous keyword density," and other spamming techniques to boost their rankings.[32]

---

[29] '604 Patent, 8:45-56.
[30] '604 Patent, 5:41-60.
[31] https://www.seobythesea.com/2014/03/incomplete-google-ranking-signals-1/
[32] https://stafflessseo.com/google-search-ranking-brief-history-known-knowns-known-unknowns-unknown-unknowns/

CONFIDENTIAL INFORMATION

30.    In order to evaluate one way in which the '604 Patent improves the performance of search engines, I designed and ran a program which is specifically designed to use the expert index described above in Section V.a. to implement the method described by claim 1 of the '604 Patent. The following diagram shows the method described by the '604 Patent as shown in Figure 2(b) of the Patent, as well as a box diagram depicting a prior art alternative:



Responding to a Search Query
Fig. 2(b)

**'604 Patent**                                    **Prior Art**

31.    As described above, those pages in the corpus with an out-degree greater than 0.10 were deemed "expert pages" and were added to a flat-file list to form an expert index. These expert documents were then used in a separate process to conduct a search in the manner described in the '604 Patent. The program looks at 100 search results, filters these results through the expert index, then returns documents from the original set of results that are pointed to (*i.e.*, internally linked to) by the expert index. This process was carried out three times using 150 queries each time in order to build a meaningful sample size. The average amount of time required to return a list of ten results using this method was 12.97 milliseconds.

**CONFIDENTIAL INFORMATION**

32.    I also ran the program a second time in order to evaluate the difference in speed between the method claimed by the '604 Patent and a hypothetical search engine which does not use the method. In this second simulation, which approximates prior art approaches, the set of expert documents stored in memory was not used; instead, the entire index is searched for the query term. From there, a new expert set is computed *at query time* by parsing and measuring the link out-degree of each page, and is used in accordance with the remaining steps described in claim 1 of the '604 Patent. This process was carried out three times using 150 queries each time in order to build a meaningful sample size. I measured the average amount of time required to return a list of ten results using this method as 24.27 milliseconds.

33.    In summary, the average amount of time required to return a list formed by, on average, ten expert results using the method of the '604 Patent was 12.97 milliseconds. In contrast, the average amount of time required using the method simulating one aspect of a prior art alternative was 24.27 milliseconds.

###### c.  The '704 Patent

34.    The '704 Patent is entitled "Method and apparatus for merging result lists from multiple search engines." The '704 Patent application was filed on August 27, 2001. The Patent "relates to reducing the computational overhead associated with merging results from multiple search engines."[33] The '704 Patent invention recites a notable improvement to prior search engine technologies: a method for merging result lists from multiple individual search engines into a single list of ranked results in a way that avoids much of the computational overhead typically associated with merging result lists by selecting only a subset of results from each search engine to evaluate.

---

[33] '704 Patent, 1:8-10.

**CONFIDENTIAL INFORMATION**

35.     At the time of the '704 Patent's invention, a single list of results presented to a user of a Web search engine could include results that were in fact retrieved by several different search engines running as separate programs, each of which only searched a portion of the distributed network of the Web. Three different search engine architectures were typically used, each with its own drawbacks: Federated, peer-to-peer, and web meta-search engines. What each of these architectures had in common was that they typically merged result lists from several individual search engines into a single list for presentation to the user, usually by examining and ranking every entry in every result list from every search engine. As the '704 Patent notes, "this ranking process can become quite computationally intensive if the number of lists or the number of entries per list is large," effectively canceling out any advantage gained by running multiple search engines simultaneously.[34]

36.     In addition to text-based webpages, search engines can gather results such as images, videos, or books in response to a query. These results may be more relevant—and therefore, more useful—to a search engine user than purely text-based pages. For example, a user seeking information about the physical appearance of particular species of bird will likely find a photograph or video of that bird more helpful than a written description. These different types of media rely on distinct search engines to index and retrieve results, so presenting them to a user as part of a single list also requires a merging process.

37.     The '704 Patent proposes a novel solution to the problems faced by then-existing approaches to merging: rather than "examining and ranking every single entry of every list," the Patent claims a method which evaluates and scores only a subset of entries from each list, "thus reducing the number of calculations required."[35] The invention then assigns a representative value

---

[34] '704 Patent, 2:51-53.
[35] '704 Patent, 2:50-3:24.

to each result list based on the scores assigned to the subset of entries, and sets forth two embodiments for merging result lists based on those representative values. The Patent describes a specific method for merging results from multiple search engines in a way that reduces the computational burden on a computer running the program without sacrificing the quality of results.

38.    As the '704 Patent explains, the prior art describes a meta-search engine apparatus that employs a process of ranking *every result* in each of several result lists.[36] In order to rank a given result, the computer system must calculate a score for that result, for example by counting the number of occurrences of query terms in the title, headings, and text of a webpage.

39.    The '704 Patent invention provides a clear advantage over prior art approaches and improves the function of a search engine utilizing it by removing the need to sacrifice time (*i.e.*, waiting for scores to be calculated for all entries on all result lists) and/or completeness (*i.e.*, intentionally leaving some search engines out in order to view the list faster).

40.    Claim 1 of the '704 Patent also contains two additional limitations which were not considered routine or conventional elements of search engine result list merging: "in a predetermined manner" and "wherein the representative value varies in accordance with predetermined manner."[37] As described above, the '704 Patent invention assigns a representative value to each search engine result list. This value is not static; instead, it is dynamically adjusted in a predetermined manner as the result lists are merged. For example, the '704 Patent explains that the representative value may be an average scoring value.[38] In one embodiment described in the specification, which selects the result list with the highest average scoring value first, the first unselected entry of that list is selected for merging first. The average scoring value (which is the

---

[36] *See* U.S. Patent No. 6,370,527.
[37] '704 Patent, 8:14-18.
[38] '704 Patent, 7:13-14.

representative value) of that list is then decremented by a certain amount. This process repeats until all entries have been selected, with the representative values of each result list varying in this predetermined manner throughout the process.[39] In another embodiment, the representative value may instead be a probability value equal to the list's "average scoring value's percentage of the total of all average scoring values" across all result lists, with results then chosen from lists in a "pseudorandom fashion" based on each list's percentage of the total.[40] These embodiments are described in claims 5-7, 11, 16-17, and 22-23 of the Patent.[41]

41.    This specific, detailed merging process was not conventional at the time of the '704 Patent's invention. Prior art meta-search engines contemplated producing a merged, ranked list based solely on the individual scores of each entry from each search engine.[42] Representative values were not routine, let alone representative values that may change dynamically throughout the ranking process. Re-calculating scores for every received search result creates the exact problems that the '704 Patent invention resolves: high computational overhead in the merging of separate result lists.

42.    In order to evaluate the degree to which the '704 patented invention improves the performance of search engines, I designed and ran a program which is specifically designed to use the database of seven English Wikimedia wikis described above in Section V.a. to implement the method described by claim 1 of the '704 Patent. The following diagram shows the method described by the '704 Patent as shown in Figure 2 of the Patent, as well as a box diagram depicting a prior art alternative:

---

[39] '704 Patent, 7:15-34.
[40] '704 Patent, 7:35-54.
[41] '704 Patent, 8:28-67; 9:12-19; 9:45-10:5; 10:37-53.
[42] *See* '527 Patent.

CONFIDENTIAL INFORMATION



FIG. 2

**'704 Patent**                    **Prior Art**

43.    As described in further detail above in Section V.a., I submitted 150 queries to each of the seven separate search engines, with each search engine running on a separate process of the HP ENVY TE01-3xxx desktop computer processor to simulate the process of submitting a query to separate Web search engines. Each search engine performs its search and ranks the results using the BM25 scorer. This process happens in parallel. Finally, each engine returns the results and scores back to a controller process. This process selects the top ranked entry as a representative value for each search engine and concatenates the results with subgroups sorted by representative

- 19 -

value. This process was carried out three times using 150 queries each time in order to build a meaningful sample size. I measured the average amount of time required to return a merged list of ten results from each search engine using this method as 20.29 milliseconds.

44.    I also ran a program to simulate the prior art alternative that merges results from each individual search engine by calculating a score for every result on each of the seven separate search engines in the central thread. This requires the entire text to be sent from each search engine and for the ranking process to be run in serial on the central process. This process was carried out three times using 150 queries each time in order to build a meaningful sample size. I measured the average amount of time required to return a merged list of ten results from each search engine using this method as 40.75 milliseconds.

45.    In summary, the average amount of time required to return a merged list of ten results using the method of the '704 Patent was 20.29 milliseconds. In contrast, the average amount of time required to return a merged list of ten results using a method simulating a prior art alternative was 40.75 milliseconds.

### d.   The '764 Patent

46.    The '764 Patent is entitled "Apparatus and method for adaptively ranking search results." The '764 Patent application was filed on May 8, 2001. The '764 Patent "describes computerized techniques for adaptively ranking documents identified in response to a search query."[43] The Patent recites a detailed apparatus and method involving the formation of a novel "viewed document database," which associates viewed documents, such as webpages, with the queries that were used to identify the documents over time.[44] A vector constructor is used to form feature vectors which "characterize[] attributes and query words associated with a document," and

---

[43] '764 Patent, 1:8-10.
[44] '764 Patent, 3:26-36.

**CONFIDENTIAL INFORMATION**

a similarity processor stored in memory then calculates a similarity score which compares a given query and a feature vector of a document in the database.[45]

47.    A feature vector is a mathematical representation of characteristics—features—of an object. Feature vectors allow machine learning algorithms to process, analyze, and compare objects by representing them numerically. As the '764 Patent explains, a feature vector can contain multiple elements which can be used to draw comparisons, such as a list of keywords, word frequency, or words of a query.[46]

48.    The '764 Patent calls for the calculation of a similarity score by using a feature vector "that characterizes attributes and query words of a ***different*** query" associated with a document produced in response to a search engine query.[47] As the '764 Patent's inventors pointed out during prosecution, using a similarity score to compare one query to an entirely different query was not a routine or conventional practice in search engine ranking at the time of the '764 Patent's invention.[48]

49.    Moreover, as the Patent Office recognized, the '764 Patent teaches assigning a rank value for a document based upon the ***combination*** of a similarity score and a relevance score, further distinguishing it from the prior art.[49] Once again, this combination was neither routine nor well-known.

50.    Another important aspect of the '764 Patent invention is its ability to "learn" over time by periodically indexing feature vectors and continually adding to its viewed document database "to provide additional information for enhancing the operation of the invention."[50] This

---

[45] '764 Patent, 3:42-43.
[46] '764 Patent, 4:31-44.
[47] '764 Patent, 6:53-54 (Claim 1).
[48] '764 Patent prosecution history, Dec. 5, 2003 Amendment and Remarks.
[49] '764 Patent prosecution history, Feb. 24, 2004 Notice of Allowability.
[50] '764 Patent, 5:48-6:30.

**CONFIDENTIAL INFORMATION**

allows the claimed apparatus and method to improve its functionality by storing and utilizing information about the behavior of users, such as the results that users choose to view.

51.     The specific data structure described in the '764 Patent marks a meaningful improvement over prior art, which could, among other things, neither compare a query with different queries used to identify a document nor learn over time by storing and utilizing data about prior user behavior.[51] This unconventional approach to ranking enhances the quality and relevance of search results by adaptively weighing both a static relevance score for a given document and a similarity score based on stored data about user behavior, all through a machine learning system that improves over time.

52.     In order to evaluate the degree to which the '764 Patent invention improves the performance of search engines, I designed and ran a program that is specifically designed to use the search engine described above in Section V.a. to implement the method described by claim 1 of the '764 Patent. The following diagram shows the method described by the '764 Patent as shown in Figure 2 of the Patent, as well as a box diagram depicting a prior art alternative:

---

[51] *See*, U.S. Patent Nos. 6,026,388 and 6,269,368.

**CONFIDENTIAL INFORMATION**



**'764 Patent**                              **Prior Art**

53.    My testing conservatively demonstrates the improvement over this prior art because, as I describe below, it includes some steps that were not performed in certain prior art systems.

54.    Each of the 150 queries submitted as described above in Section V.a. was associated with the first document in the list generated by the basic search engine system, in order to simulate the process of a human user clicking on and viewing the document. The system assumes, without loss of generality, that these first documents are useful, relevant results for the purposes of the simulation, and enters the document into a database of "viewed documents." In a deployed search engine, the first result in the displayed ranked list will not always be the one that a user clicked,

**CONFIDENTIAL INFORMATION**

but this will have no impact on performance for our tests. The system only requires that *some* link be classified as viewed for a given query; *which* specific link does not affect the speed of the process.

55.     The program then ran 150 additional unique queries, none of which were included in the original corpus of queries yielding the entries in the "viewed documents" database. For each of these new queries, the program calculates a similarity score that is used to determine which previous query yielding a particular viewed document is most similar to the new query. Finally, the viewed document in the previous step is given a boost in its ranking score by multiplying its raw score by a factor of two, which is used to produce a final list of ten ranked search results. I measured the average amount of time required to return a list of ten results using this method as 26.55 milliseconds.

56.     I also ran a program which did not calculate a similarity score to determine the degree of similarity between each new query and the previous queries, simulating one alternative method which approximates a prior art-based approach. I measured the average amount of time required to return a list of ten results using this method as 76.71 milliseconds.

57.     In summary, the average amount of time required to return a list of ten results using the method of the '764 Patent was 26.55 milliseconds. In contrast, the average amount of time required to return a list of ten results using a method simulating a prior art-based alternative approach was 76.71 milliseconds.

58.     The method described by the '764 Patent was also more effective than the prior art-based alternative approach at learning synonymous terms associated with query terms in order to produce a more relevant final list of results. This is because the alternative, edit-distance system can only detect similarity in the actual characters used in the query. By comparison, the feature

**CONFIDENTIAL INFORMATION**

vector system of the '764 Patent can be trained to associate semantically similar words such as synonyms, even if those words do not appear in the query. Several representative examples of this are shown below:

    a)  Query: "clade"

        i.  Nearest related query using feature vectors ('764 Patent method): "genus clade"

        ii.  Nearest related query without using feature vectors: "lady"

    b)  Query: "starring comedy cast"

        i.  Nearest related query using feature vectors ('764 Patent method): "comedy cast"

        ii.  Nearest related query without using feature vectors: "directed cast starring"

    c)  Query: "rugby queensland"

        i.  Nearest related query using feature vectors ('764 Patent method): "sydney queensland rugby"

        ii.  Nearest related query without using feature vectors: "queensland refer"

## VI.   CONCLUSION

59.    The results I present here are directed at demonstrating that, in some typical computing systems, the inventions claimed by the patents can provide tangible, non-routine benefits by improving total execution time and providing improved result relevancy. They are not, however, representative of the total benefit that is provided by the inventions for the purposes of, for example, their technical value.

60.    Computer systems have different tradeoffs. These tradeoffs will impact how much benefit that computer system sees from implementation of the inventions claimed by the patents.

**CONFIDENTIAL INFORMATION**

For example, all of the experiments run in this investigation were completed on a single computer system. This means that communication between sub-processes can be extremely fast. By comparison, other implementations of search systems may be distributed across many different hosts, resulting in inter-process communication being a significant bottleneck. As another example, all of the experiments run in this investigation had local access to an index on very fast flash memory. Other systems may have much slower bandwidth and higher latency to hard disks or remote storage systems, either flash or hard disk based. As another example, the systems used for this experiment were lightly loaded and were only processing a single search (or meta-search) at a time. Other systems may have significant queueing delay. As another example, the indexing, parsing, key-value lookup, and underlying execution environment of my tests is likely implemented very differently from a commercial system. This means that the relative impact of optimizing some of those functionalities will change from system to system. Finally, micro-architectural tuning, such as number of results per query and how expert pages are found, may be dramatically different in the accused system.

61.     All of these tradeoffs will likely impact an analysis of the performance benefit of a *particular* patented system as compared to a selected alternative. First, they will likely change how much the inventions claimed by the Patents impact the execution time on the patented system. They will likely also change what selected alternatives are both the closest alternative and commercially acceptable for the specific use case. Finally, they will likely change the most appropriate metrics on which the two systems should be compared.

62.     Any future analysis I perform that seeks to quantify the benefit of a particular Patent will take all of these factors into account. Such an analysis may be looking at a different situation, and a different implementation of the patented approach as compared to different alternatives, and

**CONFIDENTIAL INFORMATION**

I expect my methodology and results to change, potentially significantly, to be appropriate for that situation.

Respectfully submitted,

Dr. Amy N. Langville

5/9/22
Dated