# Exhibit 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

VALTRUS INNOVATIONS LTD.,

Plaintiff,

v.

GOOGLE LLC,

Defendant.

**Case No. 3:22-cv-00066-n**

**EXPERT DECLARATION OF DR. THOMAS M. CONTE IN SUPPORT OF
PLAINTIFF VALTRUS INNOVATIONS LTD.'S OPPOSITION TO DEFENDANT
GOOGLE'S MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(6)**

**CONFIDENTIAL INFORMATION**

**CONFIDENTIAL INFORMATION**

## I. INTRODUCTION

1. I have been asked by Valtrus Innovations Ltd. ("Valtrus") to provide my independent opinions on certain issues in connection with U.S. Patent No. 6,816,809.

## II. BACKGROUND AND QUALIFICATIONS

2. My qualifications and relevant experience are summarized below and addressed more fully in my curriculum vitae, attached as Exhibit 1 to this declaration.

3. I received my Bachelor's of Science in Electrical Engineering from the University of Delaware in 1986, and went on to complete a Ph.D. in Electrical Engineering at the University of Illinois at Urbana-Champaign in 1992.

4. I am the Associate Dean for Research and Professor of Computer Science and of Electrical & Computer Engineering at Georgia Institute of Technology ("Georgia Tech"), a position that I've held since mid-2008. Prior to that, I was a Professor of Electrical & Computer Engineering at North Carolina State University ("NC State"), from July 1995 to June 2008. I was an assistant professor of Electrical and Computer Engineering at the University of South Carolina from 1992 to 1995.

5. My current research focuses on computer architecture, including manycore architectures, microprocessor architectures, and embedded computer system architectures.

6. In 2015, I served as President of the Institute of Electrical and Electronics Engineering (IEEE) Computer Society. I am also an IEEE Fellow and have received the IEEE Computer Society's Golden Core Member award.

7. I have published extensively on issues related to computer architecture, including processor and memory architectures, and power efficiency in microprocessors. I am also an

CONFIDENTIAL INFORMATION

inventor or co-inventor of several patents related to processor architecture and other forms of computer hardware.

8.      For my time working and testifying in this litigation, I am being compensated at my normal and customary rate of $750 per hour. I am also being reimbursed for reasonable and customary expenses associated with my work and testimony in this case. My compensation is not contingent on the outcome of this litigation or the specifics of my testimony.

9.      In forming my opinions, I have considered and may rely upon all documents and information identified in this Report, and all documents and information listed below. I have also used my education and my many years of experience in the field of computer engineering. In preparing my analysis, I reviewed at least the following materials:

- U.S. Patent No. 6,816,809 ("the '809 Patent"), including the claims, specifications, drawings, file histories, and materials discussed therein

- Valtrus's Complaint

- Valtrus's Preliminary Infringement Contentions as to the '809 Patent

- Various articles related to the subject matter of the '809 Patent

III.    **ANALYSIS OF U.S. PATENT NO. 6,816,809**

10.     I have been asked to examine whether the invention claimed in the '809 Patent constituted activities or technologies that were well-understood, routine, or conventional as of its priority date of July 23, 2002.  Based on my review of the materials described above and my own expertise and experience in the computer engineering field, the invention claimed in the '809 Patent was not well-understood, routine, or conventional at the time of its invention.

**CONFIDENTIAL INFORMATION**

11.    I have also been asked to conduct independent tests in order to evaluate whether and the degree to which the '809 Patent improves the performance of a computer using the claimed invention.

12.    The '809 Patent is entitled "Hardware based utilization metering."  The '809 Patent application was filed on July 23, 2002.  The '809 Patent generally relates to processor circuity.  More specifically, its "technical field is pay-per-use systems and methods that use central processor metering to determine processor utilization for billing and other purposes."  '809 Patent, 1:6-8.

13.    In the late 1990s and early 2000s, pay-per-use—also known as metered—computer systems were becoming an increasingly-popular way for users to acquire computing capacity, as measured by processor utilization.  This arrangement allows customers to pay only for the amount of processing power that they need for a particular computing task, saving them the trouble and expense of purchasing equipment with capacity of which their processes may only require a fraction.  The equipment is instead located in data centers, which essentially "rent out" processing capacity to various customers on shared, partitioned servers.  By having servers located in data centers, customers can avoid maintaining equipment on their own premises, and can access computing capacity over a network such as the Internet.  This practice has become nearly universal today, with the vast majority of the world's most prominent companies using cloud computing (https://www.globenewswire.com/news-release/2020/06/18/2050275/0/en/The-Shift-to-Cloud-Computing-Persists-as-Organizations-Use-Multiple-Public-Clouds.html).

14.    Datacenter server systems now commonly include multiple processors and are partitioned, meaning that they run multiple operating systems on shared hardware.  This enables computer resources, such as processors and memory, to be used more efficiently than if each

CONFIDENTIAL INFORMATION

operating system ran on dedicated hardware. Because each operating system on a partitioned server is simultaneously running processes for different customers and for different purposes, these systems do not have any ability to communicate with one another.

15.    At the time of the '809 Patent's invention, "gathering processor utilization data from a hardware system require[d] communications between the [software-based] metering application and all operating systems running within the hardware." '809 Patent, 1:19-22. A customer's use of processing capacity is typically measured by clock cycles, which indicate when the processor is in use, or "busy." Because the entire process of metering processor utilization in these complex computing systems was carried out by software, then-existing solutions involved "communicating with each operating system independently, and then aggregating the information at a later time," causing complications, for example, "when network access is restricted, agent software is not installed, and operating systems are temporarily out of service." *Id.* at 3:3-8.

16.    The '809 Patent sets forth a solution to these problems, disclosing an apparatus and method for utilization metering based on *hardware* rather than software. The invention is comprised of several specific hardware components arranged in a particular manner: a state indicator coupled to a CPU, a counter coupled to the state indicator and to a system clock, and a data usage provider (also interchangeably described as a "data usage provider" by the '809 Patent)

coupled to the counter. *See id.* at 1:49-61. A non-limiting example of this apparatus is set forth in Figure 3 in the patent, shown below:



FIG. 3

17. The '809 Patent also discloses a hardware-based method for measuring processor utilization in a computer system with a plurality of processors, such as the one described above. Using inputs from the system clock and an idle indicator (which "is capable of providing either an 'idle' indication or a 'not-idle'/'busy' indication"), *id.* at 3:57-58, each counter measures CPU cycles for the CPU to which it is coupled, generating a counter value. *See id.* at 3:50-4:8. Each counter then provides its counter value to a usage data provider, which tracks these values and maintains a copy thereof.

**CONFIDENTIAL INFORMATION**

18.     The specific, hardware-based method described above has several advantages over prior art software-based approaches to measuring processor utilization.  Claim 1 recites the following:

> A *hardware based* utilization metering device, comprising:
>
> > an *idle indicator coupled to a processor*, wherein the idle indicator receives an indication when the processor is in a first state;
> >
> > a *counter coupled to the idle indicator and coupled to a system clock*, wherein the counter receives a measure of system time from the system clock and receives data related to the indication when the processor is in the first state, and generates a counter value indicative of the time the processor is in the first state; and
> >
> > a *data usage provider coupled to the counter*, wherein the data usage provider is capable of providing the counter value.

*Id.* at 7:30-43 (emphases added).

19.     As another example, claim 3 states that the idle indicator of claim 1, which is a key element of the apparatus and method used to measure processor utilization, is "a hardware device coupled to a pin of the processor, wherein the hardware device reads a signal asserted on the pin to receive the idle indication."  *Id.* at 7:49-51.  Other claims provide additional detail on how counter values are passed from the counter to the data usage provider (claims 7 and 8), how information can be communicated to an external network through the data usage provider (claim 9), and a specific structure that combines a plurality of processors, idle indicators, and counters in order to measure processor utilization in a multiprocessor system (claims 10-12).  These and other limitations make clear that the '809 Patent is specifically directed toward using hardware—not

- 7 -

<u>**CONFIDENTIAL INFORMATION**</u>

software—to measure utilization, in stark contrast to the prior art.  *See, e.g.*, U.S. Patent No. 6,049,798.

20.    The '809 Patent's prosecution history demonstrates that the prior art "specifically teaches away from hardware based methods" of processor utilization metering.  *See* '809 Patent prosecution history, Jan. 6, 2004 Amendment and Remarks.  In fact, the United States Patent Office examiner noted that "the prior arts do not disclose a plurality [of] processors and the idle indicator of processors in a busy state," *see* '809 Patent prosecution history, Jan. 8, 2004 Interview Summary, and, after conducting an updated search, issued a Notice of Allowability only a few months after the inventors of the '809 Patent made minor clarifying amendments to the claims and explained that their unconventional approach relied on hardware, not software.  *See* '809 Patent prosecution history, April 6, 2004 Notice of Allowability.

21.    As shown above in Figure 3 and described throughout the specification, the '809 Patent invention is not directed to the kind of routine, well-understood performance analysis recited as part of the prior art.  Instead, it recites a specific, novel architecture of hardware components at the circuitry level, achieving accurate, real-time measurement of processor utilization in single- or multiprocessor systems, regardless of the degree to which those systems have been partitioned for use by various software processes.

22.    Using this specific arrangement of specialized hardware to accomplish utilization metering was not a routine practice at the time of the '809 Patent's invention.  The specific apparatus and method claimed by the '809 Patent avoid the many potential pitfalls of software-based metering, including incompatibility between software utilization monitors and various operating systems, loss of counter values during a power or network loss, and the need for multiple specialized software agents in a large, partitioned system.  The invention is also distinct from the

**CONFIDENTIAL INFORMATION**

type of hardware-based analysis described in the prior art because the hardware-based approach of the '809 Patent is carried out entirely within integrated circuits, requiring no use of external equipment or specialized knowledge of the particular system to be analyzed. *See, e.g.*, U.S. Patent No. 4,503,495.

23.     I designed and ran experiments on a test system in order to evaluate the performance benefit created by the invention of the '809 Patent. My independent testing confirms that the invention claimed by the '809 Patent achieves measurable performance benefits over software-based approaches.

24.     The test system was built on an HP ENVY TE01-3xxx desktop computer, with an 12th Gen Intel® Core™ i7-12700 running at a maximum of 4.9 GHz, 16 GB of Samsung DDR4 3200 MT/s DRAM, and a 1TB NVMe SSD used as boot and data storage. The system was configured with Ubuntu 20.04, built for 64-bit x86 systems. To allow for dynamic configuration of the power management system, Hardware-Controlled P-States (HWP) was disabled, as were the "efficiency cores" of the i7-12700. This description and the platform used are consistent with the platform used by Dr. Amy Langville in another set of simulations that I understand are being performed.

25.     First, a control system that uses some of the counters identified by Valtrus involved in use of the '809 Patent was identified. I identified that the default x86 CPU frequency control driver on Linux reads APERF and MPERF in order to set the frequency, or "P-state" of a system. This driver is publicly available in the Linux kernel source code at drivers/cpufreq/intel_pstate.c (https://github.com/torvalds/linux/blob/master/drivers/cpufreq/intel_pstate.c).

26.     This frequency control driver can be disabled by setting the maximum and minimum performance control to the same, fixed value, as shown in the code segment below:

- 9 -

**CONFIDENTIAL INFORMATION**

```
static int intel_pstate_prepare_request(struct cpudata *cpu, int pstate)
{
        int min_pstate = max(cpu->pstate.min_pstate, cpu->min_perf_ratio);
        int max_pstate = max(min_pstate, cpu->max_perf_ratio);

        return clamp_t(int, pstate, min_pstate, max_pstate);
}
```

27.    Next, a benchmark workload was created to test the performance of a partitioned system, as described in the Patent. This workload was a well-known benchmark, called WebXPRT (https://www.principledtechnologies.com/benchmarkxprt/webxprt/).  WebXPRT is often used in investigations of control systems that measure idleness such as, for example, Intel's Speed Shift Technology  (https://www.anandtech.com/show/9751/examining-intel-skylake-speed-shift-more-responsive-processors).  This workload was configured to run in a virtual machine, itself running the *Ubuntu Bionic for 64-bit systems* distribution of the Linux operating system (https://app.vagrantup.com/ubuntu/boxes/bionic64).  The virtual machine was configured, started, and stopped automatically via the open-source tool *Vagrant* (https://www.vagrantup.com/docs). Inside the virtual machine, the Firefox browser (https://www.mozilla.org/en-US/firefox/new/) was used to execute the WebXPRT benchmark.  The Selenium web automation framework (https://www.selenium.dev/) was used to automatically start the WebXPRT benchmark within the browser, monitor its progress, and capture the results.  This automation is specifically supported by the WebXPRT vendor (https://bit.ly/3KUDgMl).

28.    Finally, a library was created to read the power consumed by the system during tests using the Linux kernel's *Power Capping* Framework (https://www.kernel.org/doc/html/latest/power/powercap/powercap.html).    This   framework

**CONFIDENTIAL INFORMATION**

computes the power drawn by the system by measuring microarchitectural and voltage regulation parameters.

29.     My tests used the above facilities to measure the performance of a workload inside of a partitioned server as well as the power consumed by the system while that workload runs.  It first configures the frequency control driver to run in its normal mode.  Then it starts the virtual machine, starts measuring power, runs the workload, extracts the results of the workload from inside the virtual machine, and stops measuring power.  Both the power and performance are recorded in a table.  Next, the test reconfigures the frequency control driver to run at the *base processor frequency* of my system, 2.1 GHz, and repeats the test (https://ark.intel.com/content/www/us/en/ark/products/134591/intel-core-i712700-processor-25m-cache-up-to-4-90-ghz.html).  The *base processor frequency* is the fastest stable frequency that the processor is guaranteed to run at continuously.

30.     My results are shown below:[1]

| Counters On | | Counters Off | |
| --- | --- | --- | --- |
| WebXPRT Result (Speed) | Power (W) | WebXPRT Result (Speed) | Power (W) |
| 305 | 10.41 | 152 | 9.12 |
| 312 | 10.40 | 151 | 9.11 |
| 312 | 10.32 | 151 | 9.06 |
| 306 | 10.29 | 152 | 9.13 |
| 306 | 10.47 | 152 | 9.15 |
| 310 | 10.36 | 151 | 9.14 |
| 312 | 10.29 | 152 | 9.10 |
| 307 | 10.43 | 150 | 9.10 |
| 310 | 10.41 | 152 | 9.11 |
| 307 | 10.44 | 152 | 9.11 |

---

[1] One row of this table was dropped because the powercap counters overflowed during the test. This resulted in a negative power consumption being measured, which is clearly an implausible result. I have concluded that, given the consistency of the rest of the results, and their consistency with the expected average power consumption of a modern desktop computer, that this omission has no impact on my results.

**CONFIDENTIAL INFORMATION**

|  |  |  |  |  |
|---|---|---|---|---|
|  | 310 | 10.46 | 151 | 9.11 |
|  | 313 | 10.44 | 151 | 9.10 |
|  | 310 | 10.43 | 150 | 9.09 |
|  | 310 | 10.36 | 152 | 9.12 |
|  | 309 | 10.39 | 152 | 9.09 |
|  | 311 | 10.40 | 153 | 9.13 |
|  | 307 | 10.46 | 151 | 9.06 |
|  | 308 | 10.45 | 150 | 9.08 |
|  | 313 | 10.37 | 152 | 9.08 |
| **Average** | **309.37** | **10.40** | **151.42** | **9.11** |
| **Speed / Watt** |  | 29.75 |  | 16.63 |
|  |  | **Improvement** |  | **78.9%** |

31.      I first averaged the measurements for each mode and then computed performance per watt for the two modes. Performance per watt is a critical measurement for datacenters (https://www.arm.com/blogs/blueprint/performance-per-watt).  I determined that one set of the idleness counters connected to the '809 Patent's approach provides over a 78% improvement in performance per watt in this specific exemplary use case.

IV.    **CONCLUSION**

32.      The tests described herein and the results they have produced are intended to show that in a standard use case the inventions claimed by the '809 Patent can provide tangible benefits to the performance of a computer system using the specific hardware structures and methods described in the patent.

33.      Different computer systems have different attributes and goals that influence the degree to which they may be improved by any particular technology, including the invention claimed by the '809 Patent.  The experiment described in this declaration was directed to a particular idle counter as well as a particular control loop that monitors that idle counter.

**CONFIDENTIAL INFORMATION**

Specifically, I examined the impact of the intel_pstate CPU frequency control system, which reads the APERF and MPERF counters, on the power/performance of a particular workload.

34.    The accused products may use a different subset of these counters and may use them to gain many different benefits, including benefits qualitatively and quantitatively different than those I measured for these experiments.

35.    A different and more extensive analysis would need to be performed to assess the full technical value of the invention.  The point of my analysis is to show that in a standard use case, the patented invention significantly improves hardware performance.

_____
Dr. Thomas M. Conte


   May 8, 2022
_____

Dated

- 13 -