United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALTRUS INNOVATIONS LTD., et al.,<br>Plaintiffs,<br>v.<br>GOOGLE LLC,<br>Defendant. | Case No. 26-cv-02379-PCP<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 37 |

Plaintiff Valtrus Innovations Ltd. alleges that defendant Google LLC infringes three computer patents relating to search engine software and hardware-based CPU metering. Google moves to dismiss Valtrus's first amended complaint, contending in part that each asserted claim is directed to ineligible subject matter under 35 U.S.C. § 101. For the reasons that follow, the Court agrees and grants Google's motion to dismiss without leave to amend.

**BACKGROUND**

Valtrus filed a complaint against Google in the Northern District of Texas on January 10, 2022, alleging infringement of U.S. Patent Nos. 6,728,704 (the '704 patent), 6,816,809 (the '809 patent), and 7,346,604 (the '604 patent), as well as other patents not at issue in this case. *See Valtrus Innovations Ltd. v. Google LLC*, No. 22-cv-00066-L-BN (N.D. Tex. filed Jan. 10, 2022). Valtrus thereafter filed a second complaint alleging infringement of many of the same claims in that court, and those two actions were subsequently consolidated and transferred to the Northern District of California. *See Valtrus Innovations Ltd. v. Google LLC*, No. 24-cv-01795-L (N.D. Tex. filed July 12, 2024); *see also Valtrus Innovations Ltd. v. Google LLC*, No. 25-cv-07063-PCP (N.D. Cal. transferred Aug. 21, 2025).

United States District Court
Northern District of California

On March 16, 2026, this Court granted Google's motion to dismiss the transferred consolidated action for lack of constitutional standing and claim splitting. *See Valtrus Innovations*, No. 25-cv-07063-PCP at Dkt. No. 380.[1] Valtrus initiated this suit two days later by filing a complaint in the Northern District of California on March 18, 2026, again alleging infringement of the '704, '604, and '809 patents.

## I. The '704 Patent

The '704 patent, titled "Method and Apparatus for Merging Result Lists from Multiple Search Engines," was filed on August 27, 2001, and issued on April 27, 2004. The patent teaches methods in which multiple search engines—defined as "computer programs designed to seek out information based on instructions from the user"—are deployed to search the internet for information corresponding to a user's query and those results are then returned in a single, merged "result list." '704 patent col. 1 ll. 37–44. As explained in the first amended complaint and set forth in the specification, the "sheer amount of information" and "complexity of finding information in large structures" had made searching for information on the internet cumbersome, and the '704 patent sought to streamline that process by merging the output of several search engines at once. *Id.* at col. 1 ll. 22–24.

The '704 patent teaches that prior-art search-engine methods were built on three primary "architectures"—federated, peer-to-peer, and meta-search. A federated architecture deploys the search engine to search the internet using a scanning program (called a "bot" or "spider") to build an index, which it searches, excerpts, and returns when a user enters a query. '704 patent col. 1 ll. 12–15. In the peer-to-peer architecture, a network solely comprises local computers connected to one another, such that the search engine does not need to build an index and instead distributes the search to various peer computers, each of which in turn can farm out the search to other computers in the same network. *See* '704 patent col. 2 ll. 18–28. In a meta-search construction (which can be based on either a federated or peer-to-peer architecture), the search engine acts as

[1] The Court denied Valtrus's motion to alter judgment in the transferred case on July 10, 2026. *See Valtrus Innovations*, No. 25-cv-07063-PCP at Dkt. No. 396.

an aggregator, "farming out" a user's query to other search engines and then processing the results. *Id.* at col. 1 ll. 29–33. The specification teaches that the common thread running through these architectures is the process of "merging … result lists," and the asserted methods and apparatuses teach a procedure for "merg[ing] entries from multiple lists into a single list in a manner that avoids some of the computational overhead associated with current methods." *Id.* at col. 1 ll. 57–60, col. 2 ll. 34–36.

The claimed methods operate in four basic steps. First, the search engine farms out a search to other search engines and selects a subset of entries from each returned result list. '704 patent col. 5 ll. 44–55. Second, each entry in each subset is assigned a "scoring value." *Id.* at col. 5 ll. 56–65. Third, each result list is assigned a "representative value" based on the scoring values of its entries. *Id.* at col. 5 l. 66–col. 6 l. 5. Fourth, a merged result list is created from all the entries contained in the result list subsets based on the representative value of the entries' corresponding result lists. *Id.* at col. 6 ll. 6–29.

The operative complaint alleges infringement of claims 1–6, 12, 13, and 15–17 of the '704 patent.

## II. The '604 Patent

The '604 patent, titled "Method for Ranking Hypertext Search Results by Analysis of Hyperlinks from Expert Documents and Keyword Scope," was filed on October 15, 1999, and issued on March 18, 2008. Like the '704 patent, the '604 patent also relates to "search engines that search large numbers of hypertext documents." '604 patent col. 1 ll. 10–11. Along with the complications arising from needing to parse through the sheer volume of information contained on the internet, the first amended complaint and specification assert that, "[b]ecause prior art approaches could not 'distinguish between authoritative and non-authoritative pages,' they failed to detect and screen out so-called spam pages, which are 'created for the purpose of misleading search engines and may contain spurious words that do not pertain to the topic of the page.'" FAC ¶ 254 (citations omitted) (first quoting '604 patent col. 1 ll. 41–42, then quoting *id.* at col. 1 ll. 36–38)). The '604 patent is based on a search engine created by inventors Krishna Bharat and George Mihaila called "Hilltop," which was met with industry acclaim upon release. *See* FAC ¶¶ 249–52.

The ’604 patent teaches that prior-art search engines usually based authoritativeness classifications and hence ranked results with reference to one of three metrics—human classification, usage information, or connectivity. The methods claimed by the ’604 patent are variations on the connectivity-based approach, which ranks search results based on the assumption that “authoritative pages tend to point to other authoritative pages.” ’604 patent col. 1 l. 66–col. 2 l. 3. The challenge faced by prior-art connectivity-based search engines, the specification teaches, is that existing methods failed to distinguish “between pages that are authoritative in general and pages that are authoritative on the query topic”; in other words, the search engine could not tell the difference between a source that is authoritative in general and a webpage that is source on the specific subject matter of a given search query. *Id.* at col. 2 ll. 9–10.

The claimed methods purport to “generate[] a list of target pages which are likely to be very authoritative pages on the topic of the query” using “expert pages.” ’604 patent col. 8 ll. 13–15; *see also id.* at col. 4 ll. 48–50 (“An expert page is a page that is about a certain topic and has links to many non-affiliated pages on that topic. Two pages are non-affiliated conceptually if they are authored by authors from non-affiliated organizations.”). The claimed methods proceed in three steps: one preprocessing step and two search phases. First, during the preprocessing step, a set of expert pages is created by crawling (searching through the internet and cataloguing the results), identifying expert pages, and creating a reverse index. *See id.* at col. 4 l. 58–col. 5 l. 36. Second, the reverse index is searched for expert pages containing keywords from the user query; for each matching expert page, an “expert score” is calculated from a “level score” and “fullness factor.” *Id.* at col. 6 l. 37–col. 7 l. 17. Third, targets (i.e., outgoing links from the expert pages) are identified and each assigned a “ranking score” based on the quantity and quality of expert pages that link to the target. *Id.* at col. 7 l. 18–col. 8 l. 10. The targets are presented in order of ranking score.

The operative complaint alleges infringement of claims 1–20 of the ’604 patent.

## III. The ’809 Patent

The ’809 patent, titled “Hardware Based Utilization Metering,” was filed on July 23, 2002, 2001, and issued on November 9, 2004. The patent teaches devices and methods for implementing

a hardware-based measurement of CPU utilization for deployment in pay-per-use systems using CPU metering for billing. *See* ’809 patent col. 1 ll. 6–9.

The ’809 patent teaches that prior-art systems measured CPU utilization using “software running within the computer’s operating system.” ’809 patent col. 1 ll. 17–18. As explained in the first amended complaint and set forth in the specification, software-based metering was difficult to implement in partitioned hardware because aggregating processor utilization data requires that the software communicate with all operating systems operating in the hardware. *Id.* at col. 1 ll. 23–26; *see also* FAC ¶ 132. The specification teaches that solutions in the prior art—such as communicating with each system independently and then aggregating that information later—were clunky and could be restricted when systems were temporarily out of service. ’809 patent col. 3 ll. 5–17.

The ’809 patent’s claims involve using the hardware itself (instead of an installed software application) to measure utilization, using the following components: (1) a “CPU on which multiple instances of operating systems may run”; (2) an “idle indicator … capable of providing either an ‘idle’ indication or ‘not-idle/busy’ indication”; (3) a “system clock … [that] measure[s] ticks or cycles, or any other measure of system time”; (4) a “counter” that receives input from the idle indicator and the system time; and (5) a “data provider [that] tracks the counter value” and is connected to a network. ’809 patent col. 3 l. 50–col. 4 l. 26 (reference numbers omitted); *see also id.* at col. 3 ll. 50–51. In this arrangement, CPU monitoring is carried out in three steps. First, the idle indicator communicates to the counter whether the CPU is idle or busy. Second, the system clock communicates to the counter a measure of time. Third, the counter counts for how long the CPU has been busy and communicates the counter value to the usage data provider.

The operative complaint alleges infringement of claims 2–5, 11, 13–17, 19, and 20 of the ’809 patent.

## LEGAL STANDARDS

### I. Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss an action for failure to state a claim under Rule 12(b)(6), the Court must “accept all factual allegations in the complaint as true and construe

the pleadings in the light most favorable" to the non-moving party. *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009) (quoting *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005)). The pleadings must allege facts that allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Legal conclusions "can provide the framework of a complaint," but the Court will not assume they are correct unless adequately "supported by factual allegations." *Id.* at 679.

"[I]n many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion." *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1373 (Fed. Cir. 2016). However, "plausible factual allegations may preclude dismissing a case under § 101 where, for example, nothing on the record refutes those allegations as a matter of law or justifies dismissal under Rule 12(b)(6)." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018); *accord Cooperative Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022). "If there are claim construction disputes at the Rule 12(b)(6) stage," the Court "must proceed by adopting the non-moving party's constructions," or the Court "must resolve the disputes to whatever extent is needed to conduct the § 101 analysis, which may well be less than a full, formal claim construction." *Aatrix Software*, 882 F.3d at 1125. Neither party contends that any claim construction is required to resolve this motion.

## II. 35 U.S.C. § 101

Section 101 of the Patent Act makes patentable "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." This broad provision has an important exception: "Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). In *Alice*, the Supreme Court established a two-step framework for assessing the validity of patent claims under § 101.

At step one, a court must "determine whether the claims at issue are directed to a patent-ineligible concept," including abstract ideas, natural phenomena, or laws of nature. *Alice*, 573 U.S. at 218. "To determine whether a claim is "directed to" a patent ineligible concept," the Court "evaluate[s] 'the focus of the claimed advance over the prior art to determine if the claim's

character as a whole is directed to excluded subject matter.'" *Trs. of Columbia Univ. in City of New York v. Gen Digital Inc.*, 169 F.4th 1320, 1328–29 (Fed. Cir. 2026) (quoting *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1361 (Fed. Cir. 2023)). A patent cannot "[c]laim[] a result that involves application of a natural law without limiting the claim to particular methods of achieving the result." *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1295 (Fed. Cir. 2020). "[C]ourts commonly find 'functional' claims—i.e., those that recite a result without providing details for *how* that result is to be achieved—to be directed to abstract ideas. Further, the fact that a claimed step can be performed by the human mind or a person with a pencil and paper has often been found to be an indication that the claims are directed to patent ineligible abstract ideas." *Skillz Platform Inc. v. Aviagames Inc.*, No. 21-cv-02436-BLF, 2022 WL 783338, at *6 (N.D. Cal. Mar. 14, 2022) (collecting cases).

At step two, a court must search for an "inventive concept" by considering "the elements of [the] claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 78–79 (2012)). "[T]ransformation into a patent-eligible application requires more than simply stating the abstract idea while adding the words 'apply it.'" *Id.* at 221 (quoting *Mayo*, 566 U.S. at 72). "If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290–91 (Fed. Cir. 2018). "[M]erely recite[ing] 'generic features' or 'routine functions' to implement the underlying abstract idea" is not enough. *Trinity Info*, 72 F.4th at 1367. "Nor, in addressing the second step of *Alice,* does claiming the improved speed or efficiency inherent with applying the abstract idea on a computer provide a sufficient inventive concept." *Intell. Ventures I LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015).

"An ineligibility analysis depends on "the language of the [] [c]laims themselves." Although the specification's (and prosecution history's) recitation of the problem faced and the asserted inventive solution informs the inquiry into what the combination of claimed features is

directed to, only features that are claimed, not unclaimed details that appear in the specification, can supply something beyond ineligible matter." *GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1060–61 (Fed. Cir. 2026) (alterations in original) (citations omitted) (quoting *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019)); *see also CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1374 (Fed. Cir. 2020) ("[S]tep one of the *Alice* framework does not require an evaluation of the prior art or facts outside of the intrinsic record regarding the state of the art at the time of the invention."). At step two, a patentee may avoid dismissal at the pleadings stage by making "concrete allegations" in the complaint that "individual elements and the claimed combination are not well-understood, routine, or conventional activity." *Aatrix Software*, 882 F.3d at 1128.

In the context of computer patents, "the first step in the *Alice* inquiry … asks whether the focus of the claims is on the specific asserted improvement in computer capabilities … or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016). The claims must "focus on a specific means or method that improves the relevant technology." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). "[A] patentee that emphasizes a claim's use of certain technology, for example, a general-purpose computer, fails at step two when the intrinsic record establishes that the technology is conventional or well-known in the art." *AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1380 (Fed. Cir. 2024).

## ANALYSIS

### I. The asserted claims of the '704 patent are subject-matter ineligible.

#### A. The asserted claims of the '704 patent are directed to an abstract idea.

Google argues that each of the claims of the '704 patent is directed to patent-ineligible subject matter, namely, the "abstract idea of ranking subsets of search results from multiple search engines." According to Google, each step of the methods contained in the asserted claims merely involves collecting, analyzing, and presenting information using well-known, conventional computer tools. The claims' abstractness, according to Google, is confirmed by the fact that they merely recite performing on a computer what can otherwise be performed in the human mind.

United States District Court
Northern District of California

Google also urges that the information-filtering functions recited by the claimed methods merely implement a longstanding, well-known method of organizing human behavior, analogizing the claimed method of creating and returning a merged result list to a librarian's "method of gathering books from multiple libraries" by sending requests and receiving costs for certain books and then creating a "merged list of books."

As noted above, the Court's analysis at step one begins with the claim language. Claim 1 of the '704 patent recites:

> A method of merging results lists from multiple search engines, said method comprising:
>
> [1] transmitting a query to a set of search engines;
> [2] receiving in response to said query a result list from each search engine of said set of search engines, each result list including one or more entries;
> [3] selecting a subset of entries from each result list to form a set of selected entries;
> [4] assigning to each selected entry of said set of selected entries a scoring value according to a scoring function;
> [5] assigning to each subset a representative value according to the scoring values assigned to its entries; and
> [6] producing a merged list of entries in a predetermined manner based on the representative value assigned to each result list, wherein the representative value varies in accordance with predetermined manner.

This language simply describes "transmitting," manipulating, and "producing" information associated with the user's search query. But as the Federal Circuit has noted, "[M]erely presenting the results of abstract processes of collecting and analyzing information, without more … is abstract as an ancillary part of such collection and analysis." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016). Claim 1 therefore seeks to patent a patent-ineligible abstract idea.

The method contained in independent claim 12 is substantially similar; instead of "assigning" a scoring value, the claimed method "determine[es]" a scoring value, and instead of "assigning" a representative value to each result list, method "characteriz[es] [the] subset in accordance with a representative value." Claim 12 is thus also impermissibly abstract.

Nothing in these steps separately or taken together recites anything more than using a computer to organize and manipulate data in response to a search query. The Federal Circuit has repeatedly explained that such claims are abstract. *See, e.g.*, *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("[T]he claims of the asserted patents are drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory. The concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions."); *see also Longitude Licensing Ltd. v. Google LLC*, No. 24-1202, 2025 WL 1249136, at *2 (Fed. Cir. Apr. 30, 2025) (nonprecedential) ("We have repeatedly held that claims that organize, alter, or manipulate data, without more, are patent ineligible."). As in those cases, the claimed method here merely describes receiving information and returning it in modified form. Without providing any technical means for achieving this transformation, the invention is drawn to an "essentially mental process[] within the abstract ideas category." *Elec. Power*, 830 F.3d at 1354.

Likewise, nothing in the dependent claims supplies such a limitation. To the contrary, all of the dependent claims are directed to the same abstract idea of ranking and merging subsets of search results. Claims 2 and 13 merely require that "selecting include[] selecting a consecutive number of entries from each result list, including the first entry from each result list." Claims 3, 4, 14, and 15 are directed to abstract embodiments of the selecting step, requiring selecting entries that are uniformly spaced within each result list or at random. Claims 5, 6, 16, and 17 specify creating merged lists by selecting result lists in order of decreasing average value or probability value. All of these limitations merely "employ[] mathematical algorithms to manipulate existing information to generate additional information," and such processes are "not patent eligible." *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014).

Valtrus's arguments to the contrary are unavailing. Valtrus primarily argues that the claims recite an improvement to a "specific industrial process[]," namely, the process of merging result lists gathered by multiple search engines. Citing the '704 patent's specification, Valtrus urges that the claims "recite a particular solution to a problem—the computationally intensive process of

'examining and ranking every single entry of every single list' when merging multiple lists of thousands or millions of results from multiple search engines at the same time." Opposition Brief, Dkt. No. 40, at 15 (quoting '704 patent col. 2 ll. 50–51). Thus, Valtrus urges, the claims are directed to patent-eligible "improvements to functionality and efficiency of merging Internet search engine result lists."

To be certain, "[i]f the focus of the claim is a specific and concrete technological advance, for example an improvement to a technological process or in the underlying operation of a machine," the claim succeeds at *Alice* step one. *Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 908 (Fed. Cir. 2022). The Court therefore "look[s] to whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO*, 837 F.3d at 1314. The '704 patent's claims do not satisfy this standard.

As a preliminary matter, "limit[ing] the abstract idea to a particular environment … does not make the claims any less abstract for the step 1 analysis." *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016). The fact that search engines must comb through a vast amount of data to return relevant result lists is not an inherent characteristic of the internet or of computers but rather simply reflects that there is more information on the internet than, say, in one's local library. Generically processing information does not become non-abstract merely by placing the method on the internet, not does doing so recite a "particular solution" to a technological problem.

More fundamentally, the purported technological improvement the '704 patent identifies involves nothing more than efficiency gain that is inherent in applying information processing to a generic computing environment. The claimed method "is directed not 'to an improvement to computer functionality," but to … certain information relating to the computer's operation." *Netflix, Inc. v. Broadcom Inc.*, 793 F. Supp. 3d 1168, 1182 (N.D. Cal. 2025) (quoting *Enfish*, 822 F.3d at 1335). The claim language itself does not reflect the technical improvement Valtrus ascribes to it. On the contrary, the generic, functional claim terms simply recite manipulating data, and the Federal Circuit has specifically held analogous claims to be abstract on the ground that "[t]he general recitation of the familiar concepts of ranking and selecting leaves the claimed

method 'untethered to any specific or concrete way of implementing it.'" *Cisco Sys., Inc. v. Uniloc 2017 LLC*, 813 Fed. App'x 495, 497 (Fed. Cir. 2020) (nonprecedential) (quoting *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016)).

Valtrus separately suggests that the patent satisfies *Alice* on the basis of extraneous evidence outside of not only the claim language but the patent itself. According to Valtrus:

> This patented technique has transformed Google's Search business. Only a few years after the '704 Patent issued, Google introduced its "Universal Search" feature premised on the patented elements recited above. *See* FAC, ¶ 32. Indeed, after the '704 Patent application was filed, Google hired two of the Patent's inventors, one of whom is now Google's Chief Technologist and was previously the Senior Vice President responsible for the entirety of Google Search. *See id.*, ¶ 122. The Federal Circuit has "routinely held software claims patent eligible under Alice step one when they are directed to improvements to the functionality of a computer or network platform itself." The claims of the '704 Patent fall precisely into this category, as they are directed to improvements to the functionality and efficiency of merging Internet search engine result lists. Indeed, independent testing revealed that the "average amount of time required to return a merged list … using the method of the '704 Patent was 20.29 milliseconds" compared to 40.75 "using a similar method simulating a prior art alternative." See Ex. 1, ¶¶ 77–78. The claims do not just recite goals. As Dr. Langville opines, the limitations of the claims recite specific novel data structures that need to be built to achieve the benefits that result from the Patent.

Opposition Brief, Dkt. No. 40, at 15.

The problem with this argument is that at step one, these extended discussions—which Valtrus also deploys with respect to the '604 and '809 patents—are irrelevant to the pure legal question of whether the "focus of the *claim*" is directed to patent-eligible subject matter. *Adasa*, 55 F.4th at 908 (emphasis added). "Ultimately, the § 101 inquiry must focus on the language of the Asserted Claims themselves, and the specification cannot be used to import details from the specification if those details are not claimed. Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims." *Netflix*, 793 F. Supp. 3d at 1187 (quoting *ChargePoint*, 920 F.3d at 769). To the extent that Valtrus suggests that the industry success allegedly attributable to the claims is evidence that the claims are directed to a particular solution

to a technical problem, that technical solution does not actually appear in the claims. But the Federal Circuit has repeatedly emphasized that the critical inquiry for determining whether the claims recite a particular technical solution to an existing problem lies in the specificity of the claim language itself. *McRO*, 837 F.3d at 1313 (holding that claims were not abstract because they were "limited to rules with specific characteristics"); *see also Enfish*, 822 F.3d at 1339. No such specificity is present here. "Instead of disclosing 'a specific implementation of a solution to a problem in the software arts,' or 'a specific means or method that solves a problem in an existing technological process,' the only thing the claims disclose about the use of [the claimed method] is that [claimed method] is used in a new environment." *Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1213 (Fed. Cir. 2025), *cert. denied,* 146 S. Ct. 891 (2025) (citations omitted) (first quoting *Enfish*, 822 F.3d at 1339, then quoting *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150 (Fed. Cir. 2019)).

Finally, Valtrus takes issue with Google's "strained hypothetical" librarian, urging that the '704 patent "does not automate a manual human task because humans do not manually perform merging of data returned by crawlers across the web." Opposition Brief, Dkt. No. 40, at 17. But "claims can be directed to an abstract idea even if the claims require generic computer components or require operations that a human could not perform as quickly as a computer." *Trinity Info*, 72 F.4th at 1364. Whether humans could literally perform the claimed steps as fast a computer (which self-evidently they cannot) does not change the underlying abstract nature of the claims, which recite familiar mental processes such as collecting, triaging, and collating information. In any case, none of the claims of the '704 patent even mentions deploying a crawler on the internet.

Accordingly, each claim of the '704 patent is directed to ineligibly abstract subject matter at *Alice* step one.

**B. The asserted claims of the '704 patent do not recite an inventive concept.**

Because the claims the '704 patent fails at *Alice* step one, the Court must "search for an 'inventive concept,'" an element that ensures the patent "amounts to significantly more than a patent upon the [abstract idea] itself." *Alice*, 573 U.S. at 217–18 (quoting *Mayo*, 566 U.S. at 72–73).

"A claim does not pass muster at step two by '[s]tating an abstract idea while adding the words "apply it with a computer."'" *Netflix*, 793 F. Supp. 3d at 1184 (alterations in original) (quoting *In re Killian*, 45 F.4th 1373, 1380 (Fed. Cir. 2022)). The '704 patent claims do not involve any specialized technology or concrete software application, instead requiring only "transmitting a query," "receiving a response," parsing that response based on a "scoring value," and "producing a merged list" based on a "representative value." The specification acknowledges that each of these steps was well known and conventional in the prior art. *See, e.g.*, '704 patent col. 5 ll. 46–48 ("The subsets may be selected according to any technique for selecting a few items out of a larger group[] …."), col. 5 l. 61 ("This step [of determining scoring values] is well-known in the art …."), col. 6 ll. 3–5 ("The present invention includes the step of determining this representative score according to any number of known techniques.").

Valtrus argues that "prior art search engines used 'computationally intensive' ranking processes" and that the '704 patent "offers an unconventional solution to reduce computational overhead," i.e., "a method of merging results list that improves search engine efficiency in the Internet-specific context." Opposition Brief, Dkt. No. 40, at 18. "But this merely describes the method's use of the abstract concept addressed at step 1, and an invention cannot survive step 2 by merely claiming use of a patent-ineligible concept." *Netflix*, 793 F. Supp. 3d at 1184. "[A] claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept." *BSG Tech.*, 899 F.3d at 1290; *see also ChargePoint*, 920 F.3d at 774. And deploying this method in an "Internet-specific context" does not make the claims inventive. The Federal Circuit "ha[s] 'ruled many times' that 'invocations of computers and networks that are not even arguably inventive are insufficient to pass the test of an inventive concept in the application of an abstract idea.'" *Trinity*, 72 F.4th at 1366–67 (quoting *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1170 (Fed. Cir. 2018)); *accord OIP Techs.*, 788 F.3d at 1363 ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible.").

Valtrus also argues that factual disputes preclude resolution of Google's *Alice* challenge at the pleadings stage, accusing Google of ignoring allegations in the complaint that the claimed

method "provides a combination of specific, non-conventional steps for merging result lists in this manner." FAC ¶¶ 19–20. In support of this argument, Valtrus quotes its expert declaration at length, which states:

> Claim 1: Managing results from multiple search engines by applying a scoring function to a subset of results from the search engines, using that scoring function to reflect the value of each search engine result, and merging results in a way that is defined in advance and evolves in a predetermined manner over time was not routine or well-known. This is clear from a review of the specification at 2:34–64 which I agree reflects the state of the art. Claims 2–6: Internet search engine technology was very new at the time of the Patent, and search engine queries were and remain extremely diverse. As a result, it would not be routine and well-known why using pre-defined algorithms to create result subsets would create acceptable samples for approximating the value of what a given search engine returns (claims 2–4), or how to effectively vary the representative values used for merging and selecting results over time (claims 5–6).

Langville Decl. ¶ 63.

The problem is that the "specific," "non-conventional" techniques discussed by Valtrus's expert appear nowhere in the claim language itself, which is drafted in functional, results-oriented language that does nothing to provide a "technical means" or otherwise anchor the claims to a concrete technical application. *Elec. Power Grp.*, 830 F.3d at 1351. And as described *supra*, the specification itself concedes that the claimed methods make use of generic, fundamental mathematical concepts that were well-known in the art. *See, e.g.*, '704 patent col. 5 ll. 46–48, col. 5 l. 6, col. 6 ll. 3–8. Valtrus's invocation of the allegations in the FAC and its expert's conclusory recitation of some of the factors that courts consider at *Alice* step one does not create a factual dispute precluding dismissal.

While Valtrus faults Google for "ignoring" the allegations in the FAC that the claims were not well-understood, routine, or conventional, Valtrus does not actually plead any facts to that effect. *See, e.g.*, FAC ¶ 19 ("Thus, rather than simply automating human information retrieval tasks, the invention of the '704 Patent is directed to a specific improvement in the functionality of search engines, based on complex data structures that are not capable of replication in the human mind."). Valtrus cannot survive dismissal simply by repackaging its legal conclusions as

assertions of fact. *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020) ("We disregard conclusory statements when evaluating a complaint under Rule 12(b)(6). A statement that a feature 'improves the functioning and operations of the computer' is, by itself, conclusory." (citation omitted)); *TJTM Techs., LLC v. Google LLC*, No. 25-1218, 2026 WL 1243344, at *3 (Fed. Cir. May 5, 2026) (nonprecedential) ("Conclusory allegations as to an inventive concept are insufficient to defeat a motion to dismiss."). Nor can Valtrus delay dismissal by having an expert parrot the same conclusory assertions from the complaint.

Each asserted claim of the '704 patent is directed to "merely presenting the results of abstract processes of collecting and analyzing information." *Elec. Power*, 830 F.3d at 1353–54. For that reason, the '704 patent claims fail at both of *Alice*'s steps. Google's motion to dismiss Valtrus's claim for infringement of the '704 patent is therefore granted. Because the asserted claims' patent ineligibility is apparent from the face of the claim language, dismissal is with prejudice and without leave to amend. *See, e.g.*, *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 706 (Fed. Cir. 2023); *Semiconductor Design Techs., LLC v. Cadence Design Sys., Inc.*, 735 F. Supp. 3d 1162, 1169 (N.D. Cal. 2024).

## II. The asserted claims of the '604 patent are subject-matter ineligible.

### A. The asserted claims of the '604 patent are directed to an abstract idea.

The analysis for the '604 patent is substantially similar, with Google urging that each asserted claim is directed to the ineligibly abstract idea of "generating a subset of documents and ranking documents." Like the '704 patent claims, the'604 patent claims are directed to automating a set of organizational principles in a computer environment to more quickly sort and filter information in response to a search query and are drafted in functional, results-oriented language that fails to describe how any of the methods are implemented. Claim 1 of the '604 patent recites:

> A computer-implemented method for searching a large number of hypertext documents in accordance with a search query, comprising:
>
> > [1] forming a set of expert documents from the set of all hypertext documents crawled without reference to the search query;
> > [2] ranking the expert documents in accordance with the search query;

> [3] ranking target documents pointed to by the ranked expert documents; and
> [4] returning a results list based on the ranked target documents.

The Court agrees with Google that these claims are drawn to the abstract idea of generating a subset of documents and ranking them in response to a user's search query. "The Federal Circuit has repeatedly instructed district courts that claims directed to nothing more than generating and transmitting information in response to stimuli without any asserted technological improvement are abstract." *Railware, Inc. v. Peninsula Corridor Joint Powers Bd.*, No. 25-cv-05725-BLF, 2026 WL 800129, at *9 (N.D. Cal. Mar. 23, 2026) (citing *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021); *ChargePoint*, 920 F.3d at 763; *Intell. Ventures I*, 792 F.3d at 1367).

And as with the '704 patent, nothing in the dependent claims of the '604 patent recites subject matter beyond the abstract idea of generating a subset of documents and ranking them, nor do any of the claims recite specific technical applications that would otherwise make them nonabstract. Instead, each dependent claim merely supplies abstract mathematical and logical criteria by which the claimed method is carried out, "reciting similar abstract concepts that merely collect, classify, or otherwise filter data." *Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1327 (Fed. Cir. 2017). Claims 2, 3, and 4, for example, simply specify that the "hypertext documents" are "pages in the world wide web," "sites in the world wide web," and "documents in a hypertext database," respectively. Claim 5 claims the preferred embodiment using an inverted index, which indisputably is a conventional means of organizing information. Claims 6, 7, 8, 9, and 10 are also variations on the expert reverse index embodiment and merely specify parameters under which a keyword of an expert document is included in the index. Claims 11 and 12 set additional parameters that a document must meet to be included in the set of expert documents created in the preprocessing step, respectively, requiring that the document "point[] to at least the predetermined number of targets on distinct non-affiliated hosts" and that expert documents point to "documents that share the same broad classification." Claims 13, 14, and 15 specify that

ranking target documents pointed to by expert documents include another abstract form of organizing information: ranking by target score in accordance with edge score.

Claim 16 simply supplies a mathematical relation for calculating edge scores between an expert and target document; claims 17 and 18 supply additional parameters used in the calculation of target scores, respectively, discarding the edge having a lower edge score "if two affiliated experts have edges to the same target" and providing that "two hypertext documents are affiliated if at least one of [two conditions] is true." Claim 19 specifies that the ranking of expert documents is carried out with reference to the level score for each expert document and fullness factor for each key phrase, which are themselves simple measurements related to the frequency of those keywords in the documents. *See* '604 patent col. 6 ll. 47–61 (defining level score and fullness factor). Claim 20 supplies a temporal limitation requiring that the preprocessing step "occur[] before a search query is received."

Valtrus's arguments regarding the '604 patent largely track its arguments regarding the '704 patent and fare no better. Valtrus accuses Google of oversimplifying the '604 patent claims and once again urges the Court to adopt its expert's legal conclusions that the claims are directed to nonabstract subject matter. The Court declines to do so for the reasons noted above. And although Valtrus alludes to "structures recited in the claims," Valtrus does not actually identify any of those structures. To the extent that Valtrus argues that the claims represent an "improvement" because the expert index created in the preprocessing step is "novel" (according to its expert), a novel abstract idea is still an abstract idea. *See, e.g.*, *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) ("[A] claim for a new abstract idea is still an abstract idea."); *SAP Am.*, 898 F.3d at 1170 ("[P]atent law does not protect such claims, without more, no matter how groundbreaking the advance."). Put simply, "[t]he Court is not persuaded by [Valtrus's] argument that the above constitutes an oversimplification of the claims. On the contrary, [Google's] characterization of the claimed invention tracks closely with the language of the claim language itself." *Railware*, 2026 WL 800129, at *9.

Finally, Valtrus argues that the claims are drawn to a technical improvement because the problem of spam is unique to the internet. Even assuming the truth of this questionable premise,

the argument ignores the Federal Circuit's "long recogni[tion] that '[a]n abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment." *Recentive Analytics*, 134 F.4th at 1213 (quoting *Intell. Ventures I*, 792 F.3d at 1366); *see also Affinity Labs*, 838 F.3d at 1259 ("[M]erely limiting the field of use of the abstract idea to a particular existing technological environment does not render the claims any less abstract.").

Accordingly, each claim of the '604 patent is directed to ineligibly abstract subject matter at *Alice* step one.

**B. The asserted claims of the '604 patent do not recite an inventive concept.**

In arguing that the '604 patent claims survive Google's motion, Valtrus renews its argument that the invention contained in the claims is too groundbreaking to be subject-matter ineligible. According to Valtrus:

> The claimed approach in the '604 Patent results in a demonstrable improvement in performance over prior art systems. For example, the '604 Patent's method yields result retrieval nearly twice as fast as result retrieval by a search engine that did not form an expert index in a preprocessing step. *See* Ex. 1, ¶¶ 54–55 (testing demonstrating the '604 Patent's method took an average of 12.97ms to return ten results, compared to a prior art-based alternative approach, which took an average of 24.27ms). This method implements asserted claims of the Patent. *Id.*, ¶ 56…. Consistent with this, the prior art of record "fails to disclose, among other things, forming a set of expert documents without reference to a query, and ranking expert documents in accordance with a search query." Ex. 1, ¶ 27.

Opposition Brief, Dkt. No. 40, at 12–13.

This argument again ignores the Federal Circuit's repeated admonition that "[t]o save a patent at [*Alice*] step two, an inventive concept must be evident in the claims." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017) (citing *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017)). "Here, the inventive concept identified by [Valtrus] in support of its step 2 argument is not evident in the claim language, and the Court cannot read the specification's unclaimed details into the claim. The claim language itself merely recites generalized steps … on a computer using conventional computer

activity." *Netflix*, 793 F. Supp. 3d at 1189.

The only portion of the claim language that Valtrus identifies as supplying an inventive concept is the "forming an expert index in a pre-processing step, an idea which was not routine, conventional, or well-understood at the time of the invention." Opposition Brief, Dkt. No. 40, at 12. Here, Valtrus runs into the same problem as with the '704 patent; At step two, the inventive concept must be something more than the abstract idea itself. *BSG Tech.*, 899 F.3d at 1290. Valtrus nonetheless insists that the claims "solve issues unique to the Internet through a 'specific implementation' that dramatically improves an industrial process." Opposition Brief, Dkt. No. 40, at 13 (quoting *Weisner v. Google LLC*, 51 F.4th 1073, 1086 (Fed. Cir. 2022)). The problem once again is that neither the claim language itself nor the specification sheds any light on how to carry out the functions described; simply placing these information processing techniques on a computer is not inventive, as "[i]t is well-settled that placing an abstract idea in the context of a computer does not 'improve' the computer or convert the idea into a patent-eligible application of that idea." *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1346 (Fed. Cir. 2018).

To the extent Valtrus views *Weisner* as analogous to the claims here, the Court disagrees. In *Weisner*, the Federal Circuit reversed the district court's Rule 12(b)(6) dismissal at *Alice* step two because the patentee "plausibly alleged that the … patent claims recite a specific implementation of the abstract idea that purports to solve a problem unique to the Internet." 51 F.4th at 1085. Although the patentee in *Weisner* had conceded that he did not invent the search engine algorithm, the "claims' specificity as to the mechanism through which they achieve improved search" and the complaint's factual allegations of the specific internet-centric nature of the problem that the claims addressed placed those claims in the class of "patent claims eligible at step two when they provided a specific solution to an Internet-centric problem." *Id.* at 1085–88 (citing *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257–58 (Fed. Cir. 2014)). Here, the claims contain no such specificity, and the complaint—far from pleading facts showing a specific technical problem on the internet—is built around legal conclusions that need not be credited at this stage. *See, e.g.*, FAC ¶ 256 ("An expert document and a target document derived from it is not an abstract concept[] ….").

United States District Court
Northern District of California

Each asserted claim of the ’604 patent attempts to patent “an abstract idea implemented on generic computer components, without providing a specific technical solution beyond simply using generic computer concepts in a conventional way.” *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016). For that reason, the ’604 patent claims fail at both of *Alice*’s steps. Google’s motion to dismiss Valtrus’s claim for infringement of the ’604 patent is therefore granted. For the same reasons noted above, dismissal is with prejudice and without leave to amend.

**III. The asserted claims of the ’809 patent are subject-matter ineligible.**

**A. The asserted claims of the ’809 patent are directed to an abstract idea.**

Google argues that each asserted claim of the ’809 patent is directed to the ineligible abstract idea of “tracking when a computer processor is busy.” Google acknowledges that, unlike the ’604 and ’704 patents, the ’809 patent recites a hardware-based solution to a limitation of the software solutions taught in the prior art. Nonetheless, Google urges that the claims are drawn at such a high degree of generality and without any concrete hardware components (they only recite a “processor” and “counter”) that they are limited by their terms to the abstract concept of tracking busyness. Google also suggests that the claimed invention could be accomplished by humans using observation and a pen and paper, for example, by making a note of the times that a customer is talking on the phone and counting up the total amount of time spent talking.

Beginning with the claim language itself, claim 13 recites:

> A hardware based method for measuring processor utilization in a computer system comprising a plurality of processors, the method comprising:
>
> [1] determining when any of the plurality of processors is busy;
> [2] providing a busy indication to a counter associated with a busy processor;
> [3] receiving at the counter a measure of computer system time;
> [4] incrementing a counter value in the counter based on the provided busy indication and an amount of computer system time that the processor is determined to be busy; and
> [5] maintaining the counter value.

Claim 1, from which the asserted claims depend, recites:

> A hardware based utilization metering device, comprising:
>
> > [1] an idle indicator coupled to a processor, wherein the idle indicator receives an indication when the processor is in a first state;
> > [2] a counter coupled to the idle indicator and coupled to a system clock, wherein the counter receives a measure of system time from the system clock and receives data related to the indication when the processor is in the first state, and generates a counter value indicative of time the processor is in the first state; and
> > [3] a data usage provider coupled to the counter, wherein the data usage provider is capable of providing the counter value.

The invention in both claim 1 and claim 13 proceeds by (1) "determining" when the CPU is busy, (2) "providing a busy indication" if the CPU is busy, (3) "receiving" system time from the clock, (4) "incrementing" a counter value based on the busy indication and system time inputs, and (5) "maintaining" the counter value. As Google argues, this invention is drawn at such a high level of generality that it cannot be said to be limited to anything other than simply tracking CPU usage by counting how long the CPU is used. *See Netflix*, 793 F. Supp. 3d at 1184–85 ("[The] patent speaks only to the gathering of information and the CPU utilization analysis itself, not to any subsequent steps that might be taken to solve a technical problem based on the information generated through the claimed method."). "Claims that 'do not delineate steps through which the [relevant] technology achieves an improvement' are insufficient for patent eligibility." *Trs. of Columbia Univ.*, 169 F.4th at 1329 (alteration in original) (quoting *Recentive Analytics*, 134 F.4th at 1213). Put simply, the claims are all directed to the same abstract idea of tracking busyness, which the specification concedes was a well-known, conventional concept in the field, *see* 809 patent col. 1 ll. 16–19, as confirmed by the fact that the method simply performs on a computer what can be done (and has been done) by humans with a pen and paper.

Nothing in the dependent claims changes the foregoing analysis. Claim 2 specifies that the first state is a "busy state," which is the same abstract idea of measuring busyness. Claims 3 and 4 measure whether the CPU is busy using a pin and idle loop, respectively. The specification acknowledges that these were conventional and well-known. *See* '809 patent col. 4 ll. 39–44, 46–

48. Claim 5 merely increments the counter "based on the measure of system time." Claim 10 is directed to a plurality of processors. Claim 14 "reinitaliz[es] the counter value … when the processor is turned on." Claims 19 and 20 are means-plus-functions claims for reinitializing the counter value and reporting the utilization value, which necessarily provide no technical implementation beyond the conventional structures recited in the specification and do not add anything non-abstract to the claims from which they depend. Claims 15–17 merely recite the additional abstract step of "updating" the usage data provider (claim 15), either by "periodically receiving the current counter value from the counter" (claim 16) or "polling the counter" (claim 17) and are similarly patent abstract.

Valtrus nonetheless urges that "[t]he claims of the '809 Patent recite a particular arrangement of structures which are used to carry out a detailed method for tracking processor utilization in partitioned systems." They do not. The claims simply use generic parts of a computer and do not "sufficiently describe how to achieve [the claimed] results in a non-abstract way." *Two-Way Media*, 874 F.3d at 1337; *see also Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) ("[T]he [claims] do[] not specify how the computer hardware and database are specially programmed to perform the steps claimed in the patent." (internal quotation marks and citation omitted)); *BSG Tech*, 899 F.3d at 1286 (explaining that the Federal Circuit has "consistently held … that claims are not saved from abstraction merely because they recite components more specific than a generic computer"). The hardware components recited by the claims are described merely by reference with what they do, e.g., an "idle indicator" that "indicates" whether the CPU is "idle" and a "counter" that "counts" time.

Valtrus suggests that "[t]he structures set out in the claims, a 'counter,' an 'idle indicator,' and a 'usage data provider,' are not 'black boxes'" but are instead "definite structures, as the specification makes clear." But the portions of the specification that Valtrus cites do no such thing:

> In an embodiment, the CPU utilization may be a counter value. For example, a counter may increment by 1 for each system clock cycle that the CPU is not in an idle state. The hardware means for determining if the CPU is busy may include hardware modifications to the computer system.

> The usage data provider tracks the counter value and maintains a non-volatile master copy of the counter value. When the CPU is powered on (or a hardware component containing the CPU is powered on), the saved non-volatile counter value is provided from the usage data provider to the counter to initialize the counter value in the counter. Because the usage data provider maintains a non-volatile copy of the counter value, even if the CPU, or other hardware component is removed, in addition to a loss of power situation, an up-to-date, or nearly up-to-date value of the counter value is always available.
>
> The usage data provider maintains a connection, or network interface to a system or network (not shown) that is external to the computer system. For example, the interface may be a local area network (LAN) interface to a LAN. The LAN may include a management server that receives and processes information from the various computer systems coupled to the LAN, including the counter values that indicate CPU utilization. The usage data provider can provide the current value of the counter value to the network interface.
>
> As noted above, the idle indicator provides an idle indication that the CPU is not idle. The idle indicator may be implemented as a hardware modification to the computer system. For example, some CPUs include a pin on the CPU chip that provides a halt (idle) indication. Some operating systems halt the CPU when the CPU is not processing commands (i.e., the CPU is idle), and a halt (idle) indication (i.e., a high or low, 0 or 1, value) may be asserted at the pin. In an embodiment, the idle indicator may be operated to the pin to read the halt (idle) indication. Other operating systems do not halt the CPU when the CPU is idle. Instead, the operating system may place the CPU into an idle loop, where the CPU remains until the operating system requires CPU processing. In an embodiment, a change to the operating system may be made such that upon entry into the idle loop, an externally visible register value is set to indicate the CPU is idle. When the CPU exits the idle loop, the register would be cleared. In addition the just-described two embodiments of the idle indicator, other structures and methods may be used to indicate the CPU is idle.

’809 patent col. 3 ll. 37–42, col. 3 ll. 12–34, col. 3 ll. 36–56 (reference numbers omitted). These cited portions either simply do not recite definite structures or describe embodiments to which certain dependent claims are directed. *See Longitude Licensing*, 2025 WL 1249136, at *4 (declining to “import disclosures from the specification into the claim so that it provides the [requisite] degree of specificity” where the claim itself was “framed entirely in functional, results-oriented terms”).

As with Valtrus’s invocation of extraneous extrinsic evidence with respect to the other

patents, the supposed novelty of the invention, as suggested by Valtrus's expert witness, is simply not relevant at *Alice* step one. *See, e.g.*, *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed Cir. 2013) ("[T]he important inquiry for a § 101 analysis is to look to the claim."). The language of the claims makes clear that the invention involves the abstract idea of measuring the busyness of the CPU based on the status of various hardware components, and Google is correct in pointing out that the invention automates what can be performed by humans with a pen and paper: (1) "determining when … a … phone[] … is … being used to make a call … by observing usage," (2) "making a note on paper," (3) "noting the time when the phone is busy," (4) "marking the time that passes when the phone is busy," and (5) "keeping a record of the amount of time."

While Valtrus correctly points out the use of conventional computer components does not make a claim abstract by itself, its argument misses the point. Here, nothing in the claims recites how to achieve these conventional results in a non-abstract way beyond implementing them using generic computing components. The specification concedes that the "pay-per-use concept in which the user is billed based on some measure of … utilization" is a longstanding, well-known business practice, '809 patent col. 1 ll. 12–15, akin to a parking meter. *See ChargePoint*, 920 F.3d at 766 (explaining that "the specification [is] helpful in illuminating a what a claim is 'directed to'"). Although the claims do "involve[] tangible components, the components [are] conventional and [are] used in conventional ways." *Affinity Labs*, 838 F.3d at 1261; *accord Two-Way Media*, 874 F.3d at 1338 ("Though [the patentee] argues that its proposed claim constructions sufficiently tie the claims to particular scalable network architecture, the constructions recite only conventional computer components."). They therefore remain abstract for the purposes of step one.

**B. The asserted claims of the '809 patent do not recite an inventive concept.**

At step two, Valtrus once again cites its expert's declaration that the '809 patent subject matter not conventional or well understood. According to the expert:

> At the time of the '809 Patent, examples of what was not routine and well known include the following. Claim 2: Creating a structure that was not wholly dependent on software but could work across different

> software operating systems that combine an idle indicator and a counter, and can report a busy state. This is because of the extremely diverse set of operating systems and programs that were available at the time. As the specification explains, and as I noted above, bridging across all of these was challenging. This same analysis applies to claims 3–5, 11, 13–17. Claims 3–5 describe detailed implementations of the idle indicator and counter. Claim 11 describes a multiprocessor arrangement with associated idle indicators and counters, in which the usage data provider maintains nonvolatile counter values for the processors, allowing utilization metering in multiprocessor systems running different operating systems and programs (e.g., a partitioned system running multiple virtual machines). Claims 13–17 describe an analogous hardware based method for a system with multiple processors.

Langville Decl. ¶ 23. Again, a patentee cannot avoid dismissal at the pleadings stage merely by having an expert testify to a legal conclusion.

"Allowing a claim that functionally describes a mere concept without disclosing how to implement that concept risks defeating the very purpose of the patent system." *Recentive Analytics*, 134 F.4th at 1213. To the extent that Valtrus argues that the claims survive step two merely because they implement on hardware what was formerly implemented on software, the Court disagrees. The claims here lack the kind of technical specificity for how to perform the claimed functional steps that could save them at step two. "[C]onventional computer equipment … [does] not suffice to avoid ineligibility at *Alice* step two." *Yu v. Apple Inc.*, 1 F.4th 1040, 1045 (Fed. Cir. 2021); *see also TLI Commc'ns*, 823 F.3d at 612 (explaining that the hardware component cannot merely be the "conduit for the abstract idea"). Simply implementing conventional software-based tasks on hardware—without specifying the technical means for doing so—is at bottom no different from implementing conventional human-performed tasks on a generic computer, which the Federal Circuit has repeatedly emphasized does not make an invention patent eligible. *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 911 (Fed. Cir. 2017) ("Merely reciting the use of a generic computer or adding the words 'apply it with a computer' cannot convert a patent-ineligible abstract idea into a patent-eligible invention."); *see also People.ai, Inc. v. SetSail Techs., Inc.*, 575 F. Supp. 3d 1193, 1198 (N.D. Cal. 2021), *aff'd sub nom.*, *People.ai, Inc. v. Clari Inc.*, No. 2022-1364, 2023 WL 2820794 (Fed. Cir. Apr. 7, 2023) ("The recitation of generic computer hardware or generic software structures does not transform

United States District Court
Northern District of California

an abstract idea into a patent-eligible invention."). Valtrus's invocation of difficulties in the prior art and the fact that the patent examiner found that the hardware-based implementation was not disclosed in the prior art does not bear on the threshold question whether the patents claim patentable subject matter in the first instance. *See, e.g.*, *Two-Way*, 874 F.3d at 1340 ("Eligibility and novelty are separate inquiries.").

Each asserted claim of the '809 patent does nothing more than recite "a desired function or outcome without providing any limiting detail that confines the claim to a particular solution to an identified problem." *Affinity Labs*, 838 F.3d at 1269. For that reason, the '809 patent claims fail at both of *Alice*'s steps. Google's motion to dismiss Valtrus's claim for infringement of the '809 patent is therefore granted. For the same reasons noted above, dismissal is with prejudice and without leave to amend.

**IV. Google's sealing requests are denied without prejudice.**

In connection with Valtrus's amended complaint, Valtrus filed an administrative motion to consider whether certain information deemed confidential by Google should be redacted from the complaint and the exhibits thereto. *See* Dkt. No. 24. To minimize the amount of material subject to potential sealing requests, Valtrus then filed a motion to replace exhibits 22 and 29 to the amended complaint with excerpted versions of the same documents. *See* Dkt. No. 35. The Court appreciates Valtrus's efforts to minimize sealing and grants the motion to replace. Accordingly, Valtrus's sealing motion concerning the original exhibits and Google's administrative motion to file a late response to that motion are denied as moot. *See* Dkt. Nos. 24 and 32.

Google has filed renewed sealing requests as to the amended complaint and exhibits thereto, including the replacement exhibits. *See* Dkt. No. 38. Applying the "compelling reasons standard," *see Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006), the Court denies the requests—which seek to redact huge swaths of the complaint and the exhibits, including sealing half of the exhibits in their entirety—on the basis of their overbreadth. The denial is without prejudice, and Google may file a narrowly tailored sealing motion addressing these documents within 14 days of this order. Any renewed motion must comply with Local Rule 79-5(a), which requires parties to "minimize the number of documents under seal" and "avoid

United States District Court
Northern District of California

wherever possible sealing entire documents." "[O]verly broad requests to seal may result in the denial of the motion." Civ. L. R. 79-5(f)(6). Failure to limit proposed redactions to genuinely sensitive information will result in denial of the motion and an order that all exhibits be filed on the public docket.

## CONCLUSION

For the reasons discussed herein, the asserted claims are directed to ineligible subject matter under 35 U.S.C. § 101. The Court accordingly does not and need not reach Google's remaining arguments as to the sufficiency of the allegations in the complaint as to certain asserted claims and whether Valtrus engaged in improper claim splitting. The motion to dismiss (Dkt. No. 37) is GRANTED. Dismissal is with prejudice and without leave to amend.

Valtrus's motion to replace two exhibits to the amended complaint (Dkt. No. 35) is GRANTED. Google's sealing requests (Dkt. No. 38) are DENIED without prejudice. The parties' remaining administrative motions (Dkt. Nos. 24 and 32) are DENIED as moot.

**IT IS SO ORDERED.**

Dated: August 10, 2026



P. Casey Pitts
United States District Judge